**Slip Op. 00-105**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: SENIOR JUDGE NICHOLAS TSOUCALAS

————————————————————————————————
:
SKF USA INC., SKF FRANCE S.A.        :
and SARMA,                           :
:
        Plaintiffs,                  :
:
        v.                           :    Court No. 99-08-00475
:
UNITED STATES,                       :
:
        Defendant,                   :
:
THE TORRINGTON COMPANY,              :
:
        Defendant-Intervenor.        :
————————————————————————————————:

Plaintiffs, SKF USA Inc., SKF France S.A. and Sarma (collectively "SKF"), move pursuant to USCIT R. 56.2 for judgment upon the agency record challenging various aspects of the United States Department of Commerce, International Trade Administration's ("Commerce") final determination, entitled <u>Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Romania, Sweden, and the United Kingdom; Final Results of Antidumping Duty Administrative Reviews</u>, 64 Fed. Reg. 35,590 (July 1, 1999). Specifically, SKF contends that Commerce unlawfully: (1) conducted a duty absorption inquiry under 19 U.S.C. § 1675(a)(4) (1994) for the subject reviews of the applicable antidumping duty orders; (2) determined that it applied a reasonable duty absorption methodology and that duty absorption had occurred; (3) excluded below-cost sales from the profit calculation for constructed value under 19 U.S.C. § 1677b(e)(2) (1994); and (4) valued SKF's major inputs under 19 U.S.C. §§ 1677b(f)(2)-(3), 1677e(a), 1677m(d) (1994).

**Held:** SKF's USCIT R. 56.2 motion is denied in part and granted in part. The case is remanded to Commerce to annul all findings and conclusions made pursuant to the duty absorption inquiry conducted for the subject reviews.

[SKF's motion is denied in part and granted in part. Case remanded.]

Dated: August 23, 2000

Steptoe & Johnson LLP (Herbert C. Shelley and Alice A. Kipel) for plaintiffs.

David W. Ogden, Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Velta A. Melnbrencis, Assistant Director); of counsel: Patrick V. Gallagher and David R. Mason, Office of the Chief Counsel for Import Administration, United States Department of Commerce, for defendant.

Stewart and Stewart (Terence P. Stewart, Wesley K. Caine, Geert De Prest and Lane S. Hurewitz) for defendant-intervenor.


**OPINION**

**TSOUCALAS, Senior Judge:**  Plaintiffs, SKF USA Inc., SKF France S.A. and Sarma (collectively "SKF"), move pursuant to USCIT R. 56.2 for judgment upon the agency record challenging various aspects of the United States Department of Commerce, International Trade Administration's ("Commerce") final determination, entitled Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Romania, Sweden, and the United Kingdom; Final Results of Antidumping Duty Administrative Reviews ("Final Results"), 64 Fed. Reg. 35,590 (July 1, 1999).

**BACKGROUND**

This case concerns the ninth administrative review of the outstanding 1989 antidumping duty orders on antifriction bearings (other than tapered roller bearings) and parts thereof ("AFBs") imported from France for the period of review ("POR") covering May 1, 1997 through April 30, 1998. See Final Results, 64 Fed. Reg. at 35,590; Antidumping Duty Orders: Ball Bearings, Cylindrical Roller Bearings, Spherical Plain Bearings, and Parts Thereof From France, 54 Fed. Reg. 20,902 (May 15, 1989). In accordance with 19 C.F.R. § 351.213 (1998), Commerce initiated the administrative reviews of these orders on June 29, 1998, see Initiation of Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in Part, 63 Fed. Reg. 35,188, and published the preliminary results of the subject reviews on February 23, 1999, see Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Romania, Singapore, Sweden, and the United Kingdom; Preliminary Results of Antidumping Duty Administrative Reviews and Partial Rescission of Administrative Reviews ("Preliminary Results"), 64 Fed. Reg. 8790. Commerce published the Final Results on July 1, 1999. See 64 Fed. Reg. at 35,590.

Since the administrative reviews at issue were initiated after December 31, 1994, the applicable law in this case is the antidumping statute as amended by the Uruguay Round Agreements Act ("URAA"), Pub. L. No. 103-465, 108 Stat. 4809 (1994) (effective Jan. 1, 1995).

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 19 U.S.C. § 1516a(a) (1994) and 28 U.S.C. § 1581(c) (1994).

## STANDARD OF REVIEW

In reviewing a challenge to Commerce's final determination in an antidumping administrative review, the Court will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i) (1994); see NTN Bearing Corp. of America v. United States, 24 CIT ___, ___, 104 F. Supp. 2d 110, 115-16 (2000) (detailing Court's standard of review for antidumping proceedings).

## DISCUSSION

**I.   Duty Absorption Inquiry**

   **A. Background**

   Title 19, United States Code, § 1675(a)(4) (1994) provides that during an administrative review initiated two or four years after the "publication" of an antidumping duty order, Commerce, if requested by a domestic interested party, "shall determine whether antidumping duties have been absorbed by a foreign producer or exporter subject to the order if the subject merchandise is sold in the United States through an importer who is affiliated with such foreign producer or exporter." Section 1675(a)(4) further provides that Commerce shall notify the International Trade Commission ("ITC") of its findings regarding such duty absorption for the ITC to consider in conducting a five-year ("sunset") review under 19 U.S.C. § 1675(c), and the ITC will take such findings into account in determining whether material injury is likely to continue or recur if an order were revoked under § 1675(c). See 19 U.S.C. § 1675a(a)(1)(D) (1994).

   On May 29, 1998 and July 29, 1998, Torrington requested that Commerce conduct a duty absorption inquiry pursuant to § 1675(a)(4) with respect to various respondents, including SKF, to ascertain whether antidumping duties had been absorbed during

the ninth POR.  See Final Results, 64 Fed. Reg. at 35,600.

In the Final Results, Commerce determined that duty absorption had in fact occurred for the ninth review.  See id. at 35,591, 35,600-02.  In asserting authority to conduct a duty absorption inquiry under § 1675(a)(4), Commerce first explained that for "transition orders" as defined in § 1675(c)(6)(C) (that is, antidumping duty orders, inter alia, deemed issued on January 1, 1995), regulation 19 C.F.R. § 351.213(j) provides that Commerce will make a duty absorption inquiry, if requested, for any antidumping administrative review initiated in 1996 or 1998.  Commerce concluded that (1) because the antidumping duty orders on the AFBs in this case have been in effect since 1989, the orders are transition orders pursuant to § 1675(c)(6)(C), and (2) since this review was initiated in 1998 and a request was made, it had the authority to make a duty absorption inquiry for the ninth POR.  See id.

### B.   Contentions of the Parties

SKF contends that Commerce lacked authority under § 1675(a)(4) to conduct a duty absorption inquiry for the ninth POR of the outstanding 1989 antidumping duty orders.  See SKF's Br. Supp. Mot. J. Agency R. at 2, 16-23 ("SKF's Br."); SKF's

Reply Br. at 2-30.  In the alternative, SKF asserts that even if

Commerce possessed the authority to conduct such an inquiry,

Commerce's methodology for determining duty absorption was

contrary to law and, accordingly, the case should be remanded to

Commerce to reconsider its methodology.  See SKF's Br. at 3, 23-

44; SKF's Reply Br. at 30-42.

Commerce argues that it: (1) properly construed subsections

(a)(4) and (c) of § 1675 as authorizing it to make a duty

absorption inquiry for antidumping duty orders that were issued

and published prior to January 1, 1995; and (2) devised and

applied a reasonable methodology for determining duty

absorption.  See Def.'s Mem. in Opp'n to Pls.' Mot. J. Agency R.

at 2, 5-28 ("Def's Br.").  Also, Commerce asserts that no

statutory provision or legislative history specifically provides

that Commerce is "precluded" from conducting a duty absorption

inquiry with respect to merchandise covered by a transition

order.  See id. at 2, 16.

The Torrington Company ("Torrington") generally agrees with

Commerce's contentions.  See Torrington's Resp. to Pls.' Mot. J.

Agency R. at 2-4, 8-43 ("Torrington's Resp.").  In addition,

Torrington asserts that Commerce has the "inherent" authority,

aside from § 1675(a)(4), to conduct a duty absorption inquiry in any administrative review.  See id. at 3, 32-40.

### C.  Analysis

In SKF USA Inc. v. United States, 24 CIT __, 94 F. Supp. 2d 1351 (2000), this Court determined that Commerce lacked statutory authority under § 1675(a)(4) to conduct a duty absorption inquiry for antidumping duty orders issued prior to the January 1, 1995 effective date of the URAA.  See id. at __, 94 F. Supp. 2d at 1357-59.  The Court noted that Congress expressly prescribed in the URAA that § 1675(a)(4) "must be applied prospectively on or after January 1, 1995 for 19 U.S.C. § 1675 reviews."  Id. at 1359 (citing URAA's § 291).

Because Commerce's duty absorption inquiry, its methodology and the parties' arguments at issue in this case are practically identical to those presented in SKF USA, the Court adheres to its reasoning in SKF USA.  Moreover, contrary to Torrington's assertion, the Court finds that Commerce does not have the "inherent" authority to conduct a duty absorption inquiry in any administrative review. Rather,  the statutory scheme, as noted, clearly provides that the inquiry must occur in the second or fourth administrative review after the publication of the

antidumping duty order, not in any other review, and upon the request of a domestic interested party. Accordingly, the Court finds that Commerce did not have statutory or inherent authority to undertake a duty absorption investigation for the outstanding 1989 antidumping duty orders in dispute here.

## II. Profit Calculation for Constructed Value

### A. Background

For this POR, Commerce used constructed value ("CV") as the basis for normal value ("NV") "when there were no usable sales of the foreign like product in the comparison market." Preliminary Results, 64 Fed. Reg. at 8795. Commerce calculated the profit component of CV using the statutorily preferred methodology of 19 U.S.C. § 1677b(e)(2)(A) (1994). See Final Results, 64 Fed. Reg. at 35,611. Specifically, in calculating CV, the statutorily preferred method is to calculate an amount for profit based on "the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review . . . in connection with the production and sale of a foreign like product [made] in the ordinary course of trade, for consumption in the foreign country." 19 U.S.C. § 1677b(e)(2)(A).

In applying the preferred methodology for calculating CV profit, Commerce determined that "an aggregate calculation that encompasses all foreign like products under consideration for normal value represents a reasonable interpretation of [§ 1677b(e)(2)(A)]" and "the use of [such] aggregate data results in a reasonable and practical measure of profit that [Commerce] can apply consistently where there are sales of the foreign like product in the ordinary course of trade."  Id.  Also, in calculating CV profit under § 1677b(e)(2)(A), Commerce excluded below-cost sales from the calculation which it disregarded in the determination of NV pursuant to 19 U.S.C. § 1677b(b)(1) (1994).  See id. at 35,612.

**B.    Contentions of the Parties**

SKF contends that Commerce's use of aggregate data encompassing all foreign like products under consideration for NV in calculating CV profit is contrary to § 1677b(e)(2)(A). See SKF's Br. at 44-67.  Instead, SKF claims that Commerce should have relied on the alternative methodology of § 1677b(e)(2)(B)(i), which provides a CV profit calculation that is similar to the one Commerce used, but does not limit the calculation to sales made in the ordinary course of trade, that

is, below-cost sales are not excluded from the calculation. See id. at 3, 44-63. SKF also asserts that if Commerce's exclusion of below-cost sales from the numerator of the CV profit calculation is lawful, Commerce should nonetheless include such sales in the denominator of the calculation to temper bias which is inherent in the agency's dumping margin calculations. See id. at 4, 63-67.

Commerce responds that it properly calculated CV profit pursuant to § 1677b(e)(2)(A) based on aggregate profit data of all foreign like products under consideration for NV. See Def.'s Br. at 2-3, 28-51. Consequently, Commerce maintains that since it properly calculated CV profit under subparagraph (A) rather than (B) of § 1677b(e)(2), it correctly excluded below-cost sales from the CV profit calculation. See id. Torrington agrees with Commerce's methodology for calculating CV profit. See Torrington's Resp. at 4-5, 44-50.

### C.  Analysis

In RHP Bearings Ltd. v. United States, 23 CIT __, 83 F. Supp. 2d 1322 (1999), this Court upheld Commerce's CV profit methodology of using aggregate data of all foreign like products under consideration for NV as being consistent with the

antidumping statute. <u>See id.</u> at ___, 83 F. Supp. 2d at 1336. Since Commerce's CV profit methodology and SKF's arguments at issue in this case are practically identical to those presented in <u>RHP Bearings</u>, the Court adheres to its reasoning in <u>RHP Bearings</u>. The Court, therefore, finds that Commerce's CV profit methodology is in accordance with law.

Moreover, since (1) § 1677b(e)(2)(A) requires Commerce to use the actual amount for profit in connection with the production and sale of a foreign like product in the ordinary course of trade, and (2) 19 U.S.C. § 1677(15) (1994) provides that below-cost sales disregarded under § 1677b(b)(1) are considered to be outside the ordinary course of trade, the Court finds that Commerce properly excluded below-cost sales from the CV profit calculation.

## III. Valuation of Major Inputs from Affiliated Persons

### A. Statutory Background

In general, the NV of the subject merchandise is, in pertinent part, "the price at which the foreign like product is first sold . . . for consumption in the exporting country." 19 U.S.C. § 1677b(a)(1)(B)(i) (1994). However, whenever Commerce has "reasonable grounds to believe or suspect" that sales of the

foreign like product under consideration for the determination of NV have been made at prices which represent less than the cost of production ("COP") of that product, Commerce shall determine whether, in fact, such sales were made at less than the COP.  See § 1677b(b)(1).  A "reasonable ground" exists if Commerce disregarded below-cost sales of a particular exporter or producer from the determination of NV in the most recently completed administrative review.  See § 1677b(b)(2)(A)(ii).  If Commerce determines that there are sales below the COP and certain conditions are present under § 1677b(b)(1)(A)-(B), it may disregard such below-cost sales in the determination of NV. See id.

Additionally, the special rules for the calculation of COP or CV contained in 19 U.S.C. § 1677b(f)(2)-(3) (1994), provide that, in a transaction between affiliated persons as defined in 19 U.S.C. § 1677(33) (1994), Commerce may disregard either the transaction or the value of a major input.

Section 1677b(f)(2) provides that Commerce may disregard an affiliated-party transaction when "the amount representing [the transaction or transfer price] does not fairly reflect the amount usually reflected in sales of merchandise under

consideration in the market under consideration [that is, an arms-length or market price]." If such "a transaction is disregarded . . . and no other transactions are available for consideration," Commerce shall value the cost of an affiliated-party input "based on the information available as to what the amount would have been if the transaction had occurred between persons who are not affiliated [that is, based on an arms-length or market value]." 19 U.S.C. § 1677b(f)(2) ("fair-value" provision).

Section 1677b(f)(3)'s "major input rule" directs that if (1) a transaction between affiliated companies involves the production by one of such companies of a "major input" to the merchandise produced by the other, and (2) Commerce has "reasonable grounds to believe or suspect" that the amount reported as the value of such input is below the COP, then Commerce may calculate the value of the major input on the basis of the data available regarding such COP, if such COP exceeds the market value of the input, as determined under § 1677b(f)(2). For purposes of § 1677b(f)(3), regulation 19 C.F.R. § 351.407(b) (1998) provides that Commerce will value a major input supplied by an affiliated party based on the highest of (1) the actual transfer price for the input, (2) the market

value of the input, or (3) the COP of the input.


### B. Factual Background

Because Commerce disregarded sales that failed the below-cost sales test pursuant to § 1677b(b)(1) in the prior review with respect to SKF's AFBs from France, Commerce determined pursuant to § 1677b(b)(2)(A)(ii) that it had "reasonable grounds to believe or suspect" that sales of SKF's foreign like product under consideration for the determination of NV in this ninth review might have been made at prices below the COP. See Preliminary Results, 64 Fed. Reg. at 8794. Consequently, pursuant to § 1677b(b)(1), Commerce initiated COP investigations of SKF's sales in the home market and, thereby, requested information relating to the COP and CV. See id.

In its questionnaire for this POR, Commerce requested, inter alia, that SKF provide certain data regarding the valuation of major inputs received from affiliated suppliers and used to produce the merchandise under review during the cost calculation period. See SKF's Br. App., Ex. 6, Commerce's Request for Information at D-3 and D-4. In particular, Commerce instructed

SKF as follows:

> List the major inputs received from affiliated parties and used to produce the merchandise under review during the cost calculation period. . . . For each major input identified, provide the following information:
>
> a.   the total volume and value of the input purchased from all sources by your company during the cost calculation period, and the total volume and value purchased from each affiliated party during the same period;
>
> b.   the per-unit transfer price charged for the input by the affiliated party (if the affiliated party sells the identical input to other, unaffiliated purchasers, provide documentation showing the price paid for the input by the unaffiliated purchaser; if your company purchases the identical input from unaffiliated suppliers, provide documentation showing the unaffiliated party's sales price for the input); and
>
> c.   If you are responding to this section of the questionnaire in connection with an investigation of sales below cost, provide the per-unit cost of production incurred by the affiliated party in producing the major input.
>
> . . . .
>
> With respect to I.D., when valuing the cost of major inputs purchased from affiliates, use the highest of[:] a) the transfer price from the affiliate[;] b) the affiliate's cost of production of the input; or c) the market price of the input (the weighted-average price other unaffiliated suppliers charged for the identical input). . . . In addition, in order to facilitate verification, please report, for each model which includes affiliated-party inputs, the affiliate's cost of production, transfer price, and market price of all affiliated-party inputs used in the manufacture of the product on your computer tape.

Id. at D-3, D-4, V-12.

In its response to Commerce's questionnaire, SKF reported that it valued major inputs purchased from affiliated suppliers based on the higher of the actual component (that is, input) costs or transfer prices, but it did not take into consideration the market prices for some components which it purchased from both affiliated and unaffiliated suppliers. See SKF's Br. App., Ex. 7, SKF's Sect. D Response to Commerce's Questionnaire at D-14 (Aug. 28, 1998) (noting that "SKF sources requirements from unaffiliated suppliers for only a small group of components [and that] SKF rarely buys the same components from both affiliated and unaffiliated suppliers"). With respect to market prices, SKF explained that "whether [components are] sourced from within the [SKF] Group or from an unaffiliated supplier, all SKF components are custom-made items, each conforming to SKF's proprietary designs and specifications in order to insure compatibility in assembly and quality." Id. As a consequence of its unique product specifications, SKF stated that "referent market prices" do not exist for components purchased by SKF from its affiliated companies. SKF thereby used the higher of cost or transfer price in computing COP and CV. See id. at D-17.

Given that SKF stated in its response that it purchased major inputs from its affiliated suppliers as well as in rare cases from unaffiliated suppliers, Commerce issued a supplemental questionnaire on October 26, 1998 requesting that SKF provide further information to better evaluate the market values of SKF's major inputs.  See SKF's Br. App., Ex. 8, Commerce's Supplemental Questionnaire at 9.  Specifically, Commerce asked SKF the following:

> At Appendix D-4, you provide ratios of cost to transfer prices for major inputs purchased by SKF France from affiliated parties.  However, in your supplemental response, we request that you provide a chart listing, for each major input, the per-unit transfer price charged by the affiliated party and the per-unit cost of production incurred by the affiliated party.  Furthermore, on page D-16, you state that there were rare cases in which SKF France purchased identical or similar products from an unaffiliated supplier.  For these inputs, include in your chart the unaffiliated party's sales price and provide documentation to support these prices.

Id.

On November 16, 1998, SKF responded by submitting: (1) two charts listing the total cost, total sales and the transfer price index (that is, the ratio of total cost divided by total sales) for each type of major input, but without any model or part designations; and (2) a chart showing the average unit

price for major input purchased from unaffiliated suppliers and identified by model number. See SKF's Br. App., Ex. 9, SKF's Response to Commerce's Supplemental Questionnaire at D-13 and D-14. With respect to the unaffiliated-party chart, SKF only provided documentation for one particular model input. See id. at D-14. SKF explained that it included documentation for only one input because "[d]ocumentation for each of the listed designations would be voluminous and require significant expenditure of resources just prior to verification. . . . Should [Commerce] request similar documentation for additional designations at verification, SKF would gather and provide the relevant information at that time." Id. at 51.

Subsequently, on February 16, 1999, Commerce verified SKF's COP and transfer price responses regarding the inputs, but did not verify the market value of the materials. See SKF's Br. App., Ex. 10, Commerce's Verification Report at 11. A week later, Commerce issued the Preliminary Results and stated that it would use "partial facts available" under 19 U.S.C. § 1677e (1994) "in cases in which [it was] unable to use some portion of a response in calculating the dumping margin," but made no specific reference to SKF's partial response regarding the market value of its major inputs. 64 Fed. Reg. at 8793 (Feb.

23, 1999).

For the Final Results, Commerce found that the market-price data SKF provided for components purchased from unaffiliated parties was not in a comparable form in which it reported the COP and transfer price data, "that is, the COP and transfer price values were reported as ratios (which represented the difference between COP and transfer price for each component) and the market values were not." SKF's Br. App., Ex. 11, Commerce's Final Analysis Mem. at 2 (June 16, 1999); see Final Results, 64 Fed. Reg. at 35,600 (July 1, 1999). Consequently, Commerce noted that it could not determine whether the market price was higher than the reported COP or transfer price for each major input. See id. Commerce stated that since SKF failed "to provide the requested information in the form and manner requested," it used partial facts available under § 1677e(a)(2)(B) to fill in the gaps and ensure that the market prices were taken into consideration. Id. In particular, Commerce applied partial facts available (that is, market price information SKF provided in response to Commerce's questionnaires) to make an adjustment to: (1) SKF's reported total cost of manufacturing for each transaction in the COP and CV databases; and (2) the variable cost of manufacturing in the

home market and United States sales databases.  <u>See id.</u>; SKF's Br. App., Ex. 11, Commerce's Final Analysis Mem. at 2.

### C.   Contentions of the Parties

SKF contends that Commerce erred in concluding in the <u>Final Results</u> it was "required" to use market prices for valuing certain inputs the French SKF companies purchased from affiliated parties.  <u>See</u> SKF's Br. at 69 (citing 64 Fed. Reg. at 35,599).  Quoting <u>AK Steel Corp. v. United States</u>, 203 F.3d 1330, 1343 (Fed. Cir. 2000) (holding that "the plain language of the statute . . . provides that Commerce 'may' determine the values in a manner other than the use of the transfer price") and regulation 19 C.F.R. § 351.407(b) (stating that "the Secretary normally will determine the value of a major input purchased from an affiliated person based on the higher of [transfer price, market price or COP]"), SKF notes that the fair-value and major-input provisions (that is, 19 U.S.C. § 1677b(f)(2)-(3)) are "permissive" and, therefore, do not "mandate" that Commerce use the highest of transfer price, market price or COP in valuing SKF's reported affiliated-party inputs.  <u>See id.</u> at 67-69.

SKF also asserts that Commerce's "reliance on non-

affiliated-party prices was contrary to substantial record evidence." Id. at 4. SKF notes that because the overlap between identical inputs which were purchased from affiliated and unaffiliated suppliers was minimal, and since all of SKF's components are custom-made and conform to its proprietary designs and specifications, "there is no readily observable market for the unique inputs by [SKF]." Id. at 72. SKF argues that since there were no valid referent market prices for the major inputs at issue, its valuation of these inputs based on the higher of COP or transfer price was in accordance with § 1677b(f)(2)-(3). See id. at 67.

Additionally, SKF contends that Commerce's rejection of SKF's reporting of the higher of COP or transfer price of inputs purchased from affiliated and unaffiliated suppliers, in the absence of readily observable market prices, was contrary to Commerce's practice in prior AFB reviews. See id. at 67, 85. SKF maintains that since Commerce failed to provide "a reasoned explanation for [its] departure from prior practice," Commerce's resort to partial facts available was unwarranted. Id. at 88.

SKF further argues that Commerce unlawfully used partial facts available in its cost calculations for the French SKF

Group companies because the statutory criteria Commerce relied on for such use were not present. See id. at 5, 67, 74. In particular, SKF notes that Commerce resorted to partial facts available because SKF failed to provide requested information in the form and manner requested as required by § 1677e(a)(2)(B), that is, Commerce asserted in its final analysis memorandum that SKF did not provide "'the market price data in the form which we requested (on a chart and in a comparable form as its transfer price and COP data).'" Id. at 74 (quoting SKF's Br. App., Ex. 11, Commerce's Final Analysis Mem. at 2). SKF argues that, contrary to Commerce's assertion in the final analysis memorandum, nothing in the supplemental questionnaire specifically instructed or "identified that the reporting of unaffiliated-party purchases was to be provided in a manner to permit Commerce to draw a comparison with affiliated-party purchases." SKF's Reply Br. at 66. SKF notes that "[t]he sole format specified in the response was that the [unaffiliated-party sales price] data be in chart form" and, in fact, SKF did "provide such 'prices' in chart form." Id. at 65. With respect to Commerce's request for per-unit transfer price and COP data, SKF notes that in its supplemental response it explained that it does not use such per-unit data from affiliated parties; rather,

it reported that it applies a transfer price index in its cost calculations, to ensure that the higher of cost or transfer price is reflected in its actual cost of manufacturing figures reported to Commerce.  See id.; SKF's Br. at 82-83, Br. App., Ex. 9 at 49.  Also, SKF notes this reporting methodology of transfer price indices had been utilized by SKF and accepted and/or verified by Commerce in prior reviews.  See SKF's Reply Br. at 65 n.53.  SKF, therefore, maintains that it fully and reasonably answered Commerce's questions as asked and Commerce thus erred in resorting to partial facts available.  See id. at 64-69.

Furthermore, SKF contends that, contrary to the requirements of 19 U.S.C. § 1677m(d) (1994), Commerce did not provide notice to SKF that its market price data had deficiencies and, "to the extent practicable," allow SKF to remedy such deficiencies.  Id. at 79 (quoting § 1677m(d)).  Given the seventh month period between (1) SKF's responses to Commerce's supplemental questionnaire (that is, November 16, 1998) and (2) Commerce's adverse findings in the Final Results regarding SKF's major inputs (that is, July 1, 1999), SKF argues that there was ample time for Commerce to issue a second supplemental questionnaire, inform SKF of its alleged deficiencies and give it an

opportunity to remedy them.  See id. at 79.  SKF asserts that since Commerce failed to direct another request for information, the agency improperly resorted to facts otherwise available under § 1677m(d).  See id.  Alternatively, SKF argues that even if Commerce's use of partial facts available was justified, it erred in its methodology for determining market prices for affiliated-party inputs.  See SKF's Br. at 88-89.

SKF, therefore, requests that the Court remand the matter and instruct Commerce to recalculate costs for SKF based on data submitted by SKF and without resort to partial facts available or, alternatively, if Commerce's use of partial facts available is warranted, to correct the methodology it used for calculating market prices for affiliated party-inputs.  See id. at 94-95; SKF's Reply Br. at 82-83.

Commerce argues, inter alia, that it reasonably interpreted § 1677b(f)(2) and (f)(3) as requiring it to value a major input purchased from an affiliated person at the highest of the COP, transfer price or market price.  See Def.'s Br. at 3, 51-61. Consequently, Commerce asserts that it "properly requested SKF to submit such information for its major inputs."  Id. at 62.

Commerce also maintains that even if the fair-value and

major input provisions are permissive, it is within its discretion to apply the provisions. See id. at 62. Commerce contends "that since, by SKF's own admission, some inputs were manufactured by affiliated and unaffiliated suppliers, Commerce properly exercised its discretion in applying the statutory provisions in question." Id. at 63. Commerce also notes that the fact it may not have applied the provisions in prior AFB reviews, does not make Commerce's decision to apply them in this review unreasonable. See id. at 62. Moreover, Commerce notes that no change of practice from its prior reviews occurred during this review because Commerce simply followed its regulations. See id.

Commerce also argues that irrespective of SKF's assertion that there was no readily observable market for the unique inputs purchased by SKF, § 1677b(f)(2) authorizes Commerce to value a transaction between affiliated persons based on the amount that unaffiliated persons charged. See id. at 63. Commerce thereby maintains that "[t]he application of the statute does not depend upon the existence of any 'readily observable market.'" Id.

Commerce further notes that, contrary to SKF's assertion,

its request for information in the supplemental questionnaire contemplated that SKF would provide the market-price data relating to major inputs it purchased from unaffiliated suppliers on a chart and in a form readily comparable to SKF's COP and transfer price data. See id. at 64-66. Commerce, therefore, argues that since SKF failed to submit such information in the form requested in the supplemental questionnaire, Commerce properly resorted to facts otherwise available under §§ 1677e(a) and 1677m(d) in valuing SKF's major inputs. See id. at 65-67. Moreover, Commerce maintains that its methodology for calculating the value of these inputs was reasonable. See id. at 67-69.

Torrington agrees with Commerce, noting that Commerce's instructions set forth in the supplemental questionnaire are entirely consistent with its finding in the Final Results that SKF did not provide the market-price data of the major inputs in the form in which Commerce requested. See Torrington's Resp. at 58. Torrington also notes that the questionnaire did not instruct or allow SKF to provide comparison data as a percentage ratio of COP only and, thus, there is no merit to SKF's contention that Commerce's questionnaire did not request SKF's cost data in the form in which Commerce now claims it was

requested.  <u>See id.</u> at 57-58.  Moreover, contrary to SKF's assertion that the market-price data provided was in a usable form, Torrington asserts the data clearly did not permit Commerce to make an appropriate comparison to the relevant COP and transfer price of each major input.  <u>See id.</u>

Torrington also asserts that Commerce's use of facts available was not inconsistent with § 1677m(d) because Commerce provided notice to SKF in the supplemental questionnaire that its initial response to Commerce's questionnaire was deficient and requested specific additional information.  <u>See id.</u> at 59. Torrington asserts that § 1677m(d) "does not impose on Commerce a further requirement to provide additional notice, <u>i.e.</u>, a second supplemental questionnaire, as SKF contends."  <u>Id.</u>

Moreover, Torrington argues that SKF's reliance on Commerce's acceptance of SKF's reporting methodology for major inputs in prior reviews is misplaced because "each . . . administrative review is an independent and distinct proceeding."  <u>Id.</u>  Torrington maintains that the fact that the same aspects of SKF's reporting methodology of major inputs were not pursued in other AFB reviews cannot excuse SKF from responding to Commerce's inquiries in this review.  <u>See id.</u> at

60. Similarly, Torrington contends that Commerce's methodology for valuing the major inputs "was reasonable in light of SKF's extensive reporting failures."  Id.


   D.   Analysis

   The Court disagrees with SKF that Commerce erred in valuing each major input based on the highest of the input's transfer price, market price or COP.  In Mannesmannrohren-Werke AG v. United States, 23 CIT __, __, 77 F. Supp. 2d 1302, 1310-12 (1999), the Court clearly articulated that the plain language of § 1677b(f)(2) and (f)(3), as well as the legislative history of § 1677b(f)(3), supports Commerce's use of the highest of transfer price, market price or COP in valuing a major input supplied by an affiliated party.

   Further, although the Court agrees with SKF that use of the word "may" in the fair-value and major-input provisions indicates that the provisions and regulation 19 C.F.R. § 351.407(b) are "permissive" and, thus, do not mandate the use of highest of transfer price, market price or COP in valuing affiliated-party inputs, see § 1677b(f)(2)-(3) (both provisions using word "may" instead of "shall"), the Court notes that "[t]he word 'may,' when used in a statute, usually implies some

degree of discretion." United States v. Rodgers, 461 U.S. 677, 706 (1983) (footnote omitted). Certainly, "[t]his common-sense principle of statutory construction . . . can be defeated by indications of legislative intent to the contrary or by obvious inferences from the structure and purpose of the statute." Id. (citations omitted). Here, the Court finds no such contrary indications or inferences with respect to § 1677b(f)(2)-(3) and, therefore, concludes that Commerce properly determined that it had discretionary authority to use the highest of transfer price, market price or COP in valuing SKF's reported major inputs. Indeed, in AK Steel, the appellate court opined that the antidumping "statute leaves possible application of the fair-value and major-input provisions to the discretion [of] the agency." Moreover, the fact that Commerce may not have applied the provisions in prior AFB reviews, does not make Commerce's exercise of discretion to apply them in this review unreasonable. 203 F.3d at 1343.

Also, the Court finds that Commerce properly resorted to "facts otherwise available" in valuing SKF's major inputs. The antidumping statute mandates, inter alia, that Commerce use "facts otherwise available" if an interested party fails to provide the requested information in the form and manner

requested, subject to 19 U.S.C. § 1677m(c)(1), (d), (e). See 19 U.S.C. § 1677e(a)(2). Here, upon review of the record, the Court finds that Commerce did in fact request that SKF provide market price information on major inputs it purchased from unaffiliated suppliers on a chart and in a form comparable to its COP and transfer price data. As noted earlier, Commerce's initial questionnaire specifically requested that SKF provide (1) the per-unit transfer price, market price and COP data for each major input identified and (2) the use of the highest of the transfer price, COP or market price when valuing the cost of major inputs purchased from affiliates. See SKF's Br. App., Ex. 6, Commerce's Request for Information at D-3, D-4, V-12. Commerce's supplemental questionnaire also requested, as noted earlier, that SKF provide a chart listing, for each major input, (1) the per-unit COP incurred by the affiliated party, (2) the per-unit transfer price charged by the affiliated party, and (3) for rare cases in which SKF purchase identical or similar products form an unaffiliated supplier, the unaffiliated party's sales price. See SKF's Br. App., Ex. 8, Commerce's Supplemental Questionnaire at 9. Although Commerce's framing of its questions regarding major inputs in the supplemental questionnaire are less than a model of clarity, Commerce's

questions in both questionnaires when read together indicate that Commerce was asking SKF to provide market-price information for major inputs purchased from its unaffiliated suppliers on a chart in a comparable form in which it reported the COP and transfer price information. The Court, therefore, finds that Commerce correctly determined under § 1677e(a)(2)(B) that SKF failed to provide the requested information in the form and manner requested.

To the extent that SKF argues that Commerce had an obligation under § 1677m(d) to provide a second supplemental questionnaire to inform SKF of its deficient response and give it an opportunity to remedy it, SKF's argument must also fail. Section 1677m(d) provides that if Commerce finds that a response to a request for information does not comply with the request, Commerce shall promptly inform the person submitting the response of the deficiency and permit that person an opportunity to remedy or explain the deficiency. If the remedial response or explanation provided by the party is found to be unsatisfactory or untimely, Commerce may, subject to § 1677m(e), disregard "all or part of the original and subsequent responses" in favor of facts otherwise available. Id. § 1677m(d). In this case, Commerce provided SKF with notice and an opportunity in

the supplemental questionnaire to clarify its market-price information relating to its major inputs purchased from its unaffiliated suppliers. Thus, to the extent that Commerce was statutorily obligated to provide SKF an opportunity to remedy or explain the alleged deficiencies, the Court finds that Commerce fulfilled its obligation under § 1677m(d) as well as § 1677m(e). In other words, as Torrington correctly asserts, § 1677m(d) does not impose on Commerce a requirement that it must provide an additional notice and opportunity to remedy a deficiency, that is, issue a second supplemental questionnaire.

The Court has considered SKF's other contentions and finds them to be entirely without merit. Also, the Court finds that Commerce's methodology for valuing the major inputs was reasonable in light of SKF's shortcomings in its responses to Commerce's requests for information. Accordingly, the Court finds that Commerce properly resorted to partial facts available in calculating the value of SKF's major inputs.

## CONCLUSION

For the foregoing reasons, the case is remanded to Commerce to annul all findings and conclusions made pursuant to the duty absorption inquiries conducted for the subject reviews. Commerce's final determination is affirmed in all other respects.

_____
NICHOLAS TSOUCALAS
SENIOR JUDGE


Dated:    August 23, 2000
          New York, New York