**Slip Op. 08-89**

# UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE: SENIOR JUDGE NICHOLAS TSOUCALAS**

———————————————————————————————
:
NINGBO DAFA CHEMICAL FIBER CO., LTD.;　:
CONSOLIDATED FIBERS, INC.;　　　　　　　:
FIBERTEX CORPORATION; and　　　　　　　:
STEIN FIBERS, LTD.,　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　Plaintiffs,　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　: Court No.:　07-00236
　　　　　　　v.　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　:
UNITED STATES OF AMERICA,　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　Defendant,　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　and　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　:
DAK AMERICAS LLC; NAN YA PLASTICS　　　　:
CORP. AMERICA; and WELLMAN INC.,　　　　 :
　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　Defendant-Intervenors.　　 :
　　　　　　　　　　　　　　　　　　　　　:
———————————————————————————————

Dated: September 2, 2008

**Held**: Plaintiffs' Motion for Judgment Upon the Agency Record is denied. The United States Department of Commerce's determination is affirmed.　Case dismissed.

deKieffer & Horgan, (Gregory S. Menegaz, John J. Kenkel); for Ningbo Dafa Chemical Fiber Co., Ltd.; Consolidated Fibers, Inc.; Fibertex Corporation; and Stein Fibers, Ltd.; Plaintiffs.

Gregory G. Katsas, Assistant Attorney General, Commercial Litigation Branch, Civil Division, United States Department of Justice, Jeanne E. Davidson, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Reginald T. Blades, Jr., Assistant Director, Commercial Litigation

Branch, Civil Division, United States Department of Justice, Stephen C. Tosini, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice; Of Counsel: Ahran Kang, Attorney, Office of the Chief Counsel for Import Administration, Department of Commerce, for the United States, Defendant.

Kelley Drye Collier Shannon, (Paul C. Rosenthal and David C. Smith, Jr.) for DAK Americas LLC, Nan Ya Plastics Corp. America, and Wellman, Inc., Defendant-Intervenors.

**OPINION**

**TSOUCALAS, Senior Judge**: This matter is before the Court on a motion for judgment upon the agency record brought by plaintiffs Ningbo Dafa Chemical Fiber Co., Ltd.; Consolidated Fibers, Inc.; Fibertex Corporation; and Stein Fibers, Ltd. ("Plaintiffs" or "Ningbo") pursuant to USCIT Rule 56.2. Plaintiffs challenge certain aspects of the final determination of the U.S. Department of Commerce ("Commerce" or "Defendant") in the antidumping duty investigation of polyester staple fiber ("PSF") from the People's Republic of China. Final Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances: Certain Polyester Staple Fiber from the People's Republic of China, 72 Fed. Reg. 19,690 (Apr. 19, 2007) ("Final Determination"). Domestic industry companies DAK Americas LLC, Nan Ya Plastics Corp. America, and Wellman, Inc. join as Defendant-Intervenors.

For the reasons set forth below, the United States Department

of Commerce's determination is affirmed.


## JURISDICTION

The Court has jurisdiction over this matter pursuant to 19 U.S.C. § 1516a (a) (2000) and 28 U.S.C. § 1581 (c) (2000).


## STANDARD OF REVIEW

When reviewing the final results in antidumping administrative reviews, the Court will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i) (2000). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).

Substantial evidence "is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966) (citations omitted).

**BACKGROUND**

A petition seeking initiation of an antidumping duty investigation of Certain Polyester Staple Fiber from the People's Republic of China was filed with Commerce on June 23, 2006. Public Record ("PR") Doc. No. 1. Commerce published a Notice of Initiation in the Federal Register on July 20, 2006. PR Doc. No. 12.

Ningbo Dafa, a privately held company organized under the laws of China, recycles Polyethylene terephthalate ("PET") bottle flake[1] into white, green and brown-colored PSF for sale domestically and for export throughout the world.[2] See Pls.' Rule 56.2 Mem. in Supp. of Mot. for J. upon the Agency R. ("Pls.' Br.") at 2; Def.'s Resp. to Pls.' Mot. for J. upon the Administrative R. ("Commerce Br.") at 4.[3] PET flake is purchased by Ningbo in a variety of colors, and the color (or colors) of PET flake used in the production of PSF determines the PSF's ultimate color.[4] See

---

[1] Ningbo describes PET bottle flake as "cut pieces of plastic water bottles and the like." Pls.' Br. at 3.

[2] Ningbo notes that PET flake constitutes nearly 100% of the raw material by weight used in production of its recycled PSF covered by the scope of this investigation. See Pls.' Br. at 3.

[3] Unless otherwise noted, reference to all documents herein shall refer to the public version of those documents.

[4] Therefore, by and large, white PSF is made from white PET flake, green PSF from green PET flake and brown PSF from brown PET flake. See Commerce Br. at 4.

Commerce Br. at 4.

The parties agree that white PET flake is more expensive to purchase than green PET flake, while green is more expensive to purchase than brown PET flake. See PR Doc. No. 261; Commerce Br. at 4. Similar to the PET flake cost hierarchy, once PET flake is processed into PSF, white PSF is sold at higher prices than green PSF, while green PSF is sold at higher prices than brown PSF. Id.

On September 18, 2006, Commerce recommended that in selecting respondents in this investigation it is most appropriate to choose the exporters or producers that account for the largest volume of subject merchandise during the period of investigation ("POI"), based on volume of total metric tons shipped.[5] The three exporters or producers thus selected were Ningbo, Cixi Jiangnan Chemical Fiber Co., Ltd., and Far Eastern Industries Ltd. See PR Doc. No. 77.

On September 20, 2006, Commerce sent its antidumping duty questionnaire to Ningbo Dafa, requiring the company to report its factors of production and any market economy purchases made by the company during the POI. See Investigation of Certain Polyester Staple Fiber from the People's Republic of China: Issues and Decision Memorandum ("I&D Memo") at 58 (April 10, 2007). In its November 8, 2006 response, Ningbo Dafa reported on its market-

---

[5]  The POI here is October 1, 2005, to March 31, 2006.

economy purchases ("MEPs") of PET bottle flake, but did not include a breakdown by color. PR Doc. No. 120;  Confidential Record ("CR") Doc. No. 57.

On November 11, 2006, Commerce issued Ningbo Dafa a supplemental questionnaire that requested MEP worksheets for each product type sold in the United States during the POI.  PR Doc. No. 129.  On December 6, 2006, Ningbo Dafa submitted its supplemental questionnaire response, including an MEP worksheet that did not provide a breakdown by color of PET flake purchases, and stated that for PSF, the finished "color is a simple function of the color of the material input used, not the quantity of material used." PR Doc. No. 153; CR Doc. No. 69.  Commerce relied on Ningbo's numbers in this response for its preliminary determination. See Preliminary Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances: Certain Polyester Staple Fiber from the People's Republic of China, 71 Fed. Reg. 77,373 (Dec. 26, 2006)  ("Preliminary Determination").

On January 31, 2007, Commerce sent Ningbo a MEP supplemental questionnaire asking again for Ningbo Dafa to specifically identify the "quantities, values and average-unit values of your market economy purchases of gross flake, segregated by color."[6] PR Doc.

---

[6]  Commerce noted that Ningbo Dafa's previous December 2006 submission did not submit MEP data in the manner requested.  The supplemental questionnaire stated that "[t]he Department is

(continued...)

No. 208.  Ningbo's response stated that "since the raw material purchase invoices do not always specify the colors and since the company does not track inventory by specific colors in its raw material inventory ledgers, it is not possible to complete the MEP spreadsheet by segregating MEP purchases by color."  PR Doc. No. 218.

Commerce conducted an on-site verification of Ningbo Dafa during February 2007.  During this visit company officials informed Commerce that Ningbo Dafa needs to be able to make all colors of PSF at anytime and that in order to do so Ningbo maintains a large inventory of flake (two to three months) at all times to ensure the proper colors of gross flake are available. PR Doc. No. 232.

In its Final Determination Commerce determined that PSF from the PRC is being, or is likely to be, sold in the United States at less than fair value ("LTFV") as provided in section 735 of the Tariff Act of 1930, as amended ("the Act").  Commerce assigned Ningbo a weighted-average dumping margin rate of 4.86%, up from the rate of 4.39% assigned Ningbo in the Preliminary Determination.[7]

---

[6](...continued)
providing Ningbo Dafa with a final opportunity to provide a market economy purchase spreadsheet for gross flake, inclusive of the color." PR Doc. No. 208.

[7]  Ningbo notes that "[i]n the final determination in the underlying investigation, margins dropped dramatically for all

(continued...)

Oral argument for this case was held before this Court on April 14, 2008.

**DISCUSSION**

I. Color-Specific Flake Valuation

As referenced above PET flake constitutes the main raw material used by Ningbo in production of recycled PSF. Commerce determined that because color-specific PET flake purchases had a direct effect upon the price of the finished PSF, that therefore this information was necessary to calculate normal value accurately. Commerce Br. at 11. With the exception of a few MEP invoices which identified color, Ningbo did not (Ningbo argues that it could not) report color-specific PET flake costs.[8] Pls.' Br. at 14.

Plaintiffs argue that color-specific PET flake valuation was not necessary for an accurate calculation of Ningbo's normal value, and therefore cannot be the basis for Commerce using "facts available." See Id. at 23. The Court will address initially the premise of Plaintiffs' argument (i.e., whether Commerce reasonably determined that color-specific flake

[7](...continued)
respondents except for Ningbo Dafa due to many general adjustments and a few specific adjustments to the antidumping margins." Pls.' Br. at 16.

[8] Ningbo notes that it purchases PET flakes in dozens of shades of colors, including whites, greens, browns, blues, reds and mixed color batches. Pls.' Br. at 5.

valuation was necessary for an accurate calculation of Ningbo's normal value).[9]

The crux of Plaintiffs' argument as to this issue is that Commerce "disregarded [the color-specific] requirement" for other PET raw materials used by the other mandatory respondents manufacturing colored PSF in this investigation. Id. at 23-24. The implication by Ningbo seems to be therefore that color-specific valuation is not necessary for an accurate calculation of normal value in its case. By way of example, Ningbo notes that Far Eastern Textiles and Cixi Jiangnan both reported consumption of various types of PET fiber waste and Commerce valued these materials according to a single average rupee per kilogram value of such fiber imports reported in the Indian Import Statistics of the World Trade Atlas ("WTA"), irrespective of color. See Id. at 24; I&D Memo (Comment 7). Ningbo also points out that Commerce recognized that the tariff number of the fiber imports, HTS 5505.10, is not color-specific. See Pls.' Br. at 24; I&D Memo (Comment 7).

Plaintiffs also note that Commerce "frequently encounters [the] situation in non-market economy cases . . . where the surrogate values available . . . do not permit an exact match to

---

[9] Commerce's use of "facts available" based on its determination that color-specific valuation was necessary will be addressed in the following section of this opinion.

the physical properties of a particular respondent's inputs." Pls.' Br. at 25. Plaintiffs state that Commerce, therefore, routinely fulfills its statutory mandate to select the "best available information" to value factors of production by resort to less specific references for surrogate values. Id. For this proposition, Plaintiffs cite to Polyethylene Retail Carrier Bag Comm. v. U.S., 29 CIT 1418 (2005), stating that there the Court upheld the Department's preference for less color-specific WTA import statistics over domestic color-specific Indian prices. Pls.' Br. at 25.

For its part, Commerce responds that the Plaintiffs' assertion that color-specific cost reporting is not essential to normal value is belied by the fact that Ningbo's PSF pricing was dependent upon the color of the PET flake used during production. See Commerce Br. at 11. Commerce also points out that fellow PSF producer Cixi Jiangnan noted that recognizing color-specific values for PSF "could improve the accuracy of the antidumping margin calculations."[10] Id. at 12; PR Doc. No. 74.

Commerce states that Plaintiffs' contention that Commerce considered color-specific valuation unnecessary in other investigations is unavailing. Commerce Br. at 13. As to Polyethylene Retail Carrier Bag Comm., 29 CIT 1418, Defendant

---

[10] Cixi Jiangnan noted that, in its case, different colors of PSF are marketed and sold differently and the materials are acquired differently. PR Doc. No. 74; Commerce Br. at 12.

distinguishes the case by stating that color was not an important factor in valuing consumption of ink (which was the factor in issue in that case).  Commerce Br. at  13.

The essential element of Commerce's determination therefore is that because the color of PET flake affected the price of the finished PSF product, it was reasonable to request color-specific flake values.  The Court finds that Commerce's determination as to this point is supported by substantial evidence in the record and the Court will not re-weigh the evidence.

Commerce correctly points out that as a general rule, it "has the discretion and 'authority to determine the extent of investigation and information it needs.'" Polyethylene Retail Carrier Bag Comm., 29 CIT at 1433 citing PPG Indus. Inc. v. United States, 978 F.2d 1232, 1238 (Fed. Cir. 1992); Commerce Br. at 11.  The colors of PET flake that Ningbo produces (white, green and brown) are bought at different prices and the corresponding finished recycled PSF is sold at different prices. The three PSF  colors Ningbo produces are in a sense three distinct products and it is therefore reasonable that Commerce would request color-specific valuation of Ningbo's PET flake purchases that comprise the finished PSF products.

Ningbo's argument here, resting as it does on certain of Commerce's determinations in this investigation as to Far Eastern Textiles and Cixi Jiangnan, with nothing more, is not persuasive.

The facts relevant to the Far Eastern Textiles and Cixi Jiangnan determinations are different from the case at hand, and so it is not surprising that certain aspects of those two determinations are different from this one.[11]

II. Application of "Facts Available"

In calculating an antidumping duty margin rate, if "necessary information is not available on the record . . . [Commerce] shall, subject to [19 U.S.C. § 1677m(d)], use the facts otherwise available" in calculating the rate. 19 U.S.C. § 1677e(a).

As referenced above, Commerce applied "facts available" in calculating the value of Ningbo's PET flake purchases because it determined that color-specific information was necessary to calculate normal value accurately and Ningbo did not provide color-specific information.[12]  See Final Determination.  Ningbo

---

[11]  Although Commerce does not directly address the Far Eastern Textiles and Cixi Jiangnan valuations in its brief, the Court notes that the circumstances relevant to the determinations of those two companies, including Far Eastern Textiles' and Cixi Jiangnan's  MEPs, are not directly analogous to the circumstances here. See I&D Memo.

[12]  Commerce having found that total adverse facts available was not warranted here, stated that "because Ningbo Dafa failed to provide information in the form and manner requested by the Department and did not suggest alternative forms in which it was able to submit the requested information, the Department, in accordance with sections 776(a)(2)(B) and 782(c)(1) of the Act, has applied partial facts available to Ningbo Dafa's PET flake."

(continued...)

Dafa did not make color-specific data available in the initial questionnaire nor subsequent correspondence because it did not maintain color-specific records.  See Commerce Br. at 14.

There is therefore a basic two-prong analysis revolving around the necessity of the information and its availability on the record.  The Court found supra that Commerce's determination, that color-specific prices of Ningbo's PET flake were necessary to calculate an accurate antidumping margin, was a reasonable one, and therefore prong one is satisfied.  As to the second prong, the parties concede that there is not any significant color-specific information on the record, and so this prong is also satisfied.  Consequently the application of "facts available" by Commerce is lawful and reasonable under the circumstances herein.

III. Commerce's PET Flake Valuation Methodology

When factors of production are purchased from market economy suppliers and paid for in market economy currency, as is the case here, Commerce will generally value these factors using the market economy price.  See 19 C.F.R. § 351.408(c)(1);  Commerce Br. at 3.

_____

[12](...continued)
I&D Memo at 58.

As discussed above, only a small percentage of Ningbo's MEP invoices of PET flake indicated a color, and where a color was indicated it was white or green. None of Ningbo's MEP invoices indicated the color brown (the lowest cost flake). In explaining the valuation process it took concerning Ningbo's MEP invoices, Commerce noted that under

> "partial facts available, because Ningbo Dafa
> did have some invoices reflecting white and
> green PET flake, we have used these prices to
> calculate a surrogate value for these
> purchases of flake. Because Ningbo Dafa's
> invoices do not reflect a value for brown PET
> flake, the Department has subtracted the
> quantities and values contained on the
> invoices for white and green PET flake from
> the total quantity and value (excluding
> Thailand and South Korea) of all Ningbo
> Dafa's market economy purchases of PET
> flake." (Citations omitted)

I&D Memo at 58-59.

In other words, the few invoices that indicated white and green provided Commerce with values from which to extrapolate the total value of Ningbo's white and green PET flake purchases. Accordingly, the great majority of Ningbo's MEP invoices (i.e., the invoices that did not identify any PET flake color whatsoever) were assigned the color brown by Commerce.

Commerce quotes the Statement of Administration Action Accompanying the Uruguay Round Agreements Act ("SAA") as saying that "neither Commerce nor the Commission must prove that the facts available are the best alternative information. Rather, the

facts available are information . . . which are reasonable to use under the circumstances." H.R. REP. No. 103-316, at 869-70 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4198-99; Commerce Br. at 15.

Commerce notes that if it finds remedial responses to be unsatisfactory, it "may, subject to section 1677m(e), disregard 'all or part of the original and subsequent responses' in favor of facts otherwise available." SKF USA Inc. v. United States, 116 F. Supp. 2d 1257, 1268, 24 CIT 822, 835 (2000); Commerce Br. at 14.

Ningbo argues that the Department's choice of facts available was not "neutral" because "it significantly increases the overall cost of Ningbo Dafa's key raw material over the verified audited actual total cost." Pls.' Br. at 36. Plaintiffs criticize Commerce for, among other things, assigning approximately 95 percent of the flake tonnage in the MEP invoices to the color brown, and in so doing assigning brown PET flake, the lowest cost color, the average value of all PET flake. Id. at 36-38. Ningbo argues that "POI production and sales quantities of brown PSF were well under 10 percent." Id. at 22.

Commerce does not address Ningbo's production and sales quantities numbers directly but instead argues that Ningbo "provides an array of calculations in an attempt to demonstrate that the facts used were adverse [but that] these speculative

calculations were not proffered during the investigation, and thus, Commerce lacked the opportunity to consider them." Commerce Br. at 16. Although the Court does not agree with Commerce's stance here, it does concur with Commerce's alternative argument that Ningbo's calculations fail to demonstrate that the use of average prices for white, green and brown flakes created higher dumping margins than if Ningbo Dafa had provided actual PET flake purchase prices by color. Id. at 17.

The Court finds that the approach Commerce took was a reasonable one under the circumstances. Having no way to reconstruct the actual PET flake colors associated with those MEP invoices that did not indicate any color, Commerce used what little information it had to fashion its approach, factoring in the non-color indicating MEPs as brown. The white and green PET flake prices were simply an average of the white- and green-specific invoices, respectively. Commerce then divided the average price by the net quantity of known white and green PET flake purchases. This part of the methodology is straight-forward as Commerce simply used the only definite color-specific information it had on the record. For its part, Ningbo does not put forth a credible argument that these prices are somehow unrepresentative of white or green prices as a whole. The Court therefore finds that Commerce's approach here was reasonable and

supported by substantial evidence on the record.

The assigning of the remainder of Ningbo's MEP invoices (i.e., the invoices that did not identify any PET flake color whatsoever) the color brown, raises a different analysis. Here, absent any information to the contrary, Commerce selected as a default the color brown (the least expensive of the PET flake colors). Because there is no definitive way to tell which PET flake colors these non-color identifying invoices can actually be attributed to, the Court finds that Commerce's approach here under the circumstances was reasonable and supported by substantial evidence on the record. While it is true that Commerce could have selected alternate methods to allocate the non-color identifying invoices by color, it is also true that because of the lack of information on the record that these alternatives would also be imperfect surrogates. Ultimately, the record does not indicate a clearly better method for valuation than the one used by Commerce.

IV. The Reliability of the Color-Specific Invoices

Plaintiffs argue that Commerce's "reliance on a handful of [MEP] supplier invoices to value Ningbo Dafa's PET bottle flake cost on a color-specific basis" was not reasonable nor in accordance with the law. See Pls.' Br. at 27.

Plaintiffs note that Commerce is directed by statute to

select the "best available information" for valuing the factors

of production in the calculation of normal value. See Id.; 19

U.S.C. § 1677b(c)(1).  While Ningbo concedes that there is a

preference for the valuation of raw materials from qualifying

market suppliers where possible (19 C.F.R. § 351.408(c)(1)), it

notes that there is a qualification to this preference in that

the market sources must be in sufficient quantities relative to

the overall quantity purchased so as to be reliable and

representative of that overall quantity.[13]  Pls.' Br. at 27-28

citing Antidumping Methodologies: Market Economy Inputs, Expected

Non-Market Economy Wages, Duty Drawback; and Request for

Comments, 71 Fed. Reg. 61716 (Oct. 19, 2006).  Ningbo explains

that it did not have market purchases in any specific color that

equaled or exceeded five percent of its MEPs.[14]  Pls.' Br. at 29.

Therefore, Ningbo concludes, the few color-specific prices cannot

lawfully be attributed to all of production. Id. at 31.

Commerce counters that it need not use surrogate data when a

factor is purchased from a market economy supplier in a market

---

[13]  Ningbo notes that Commerce indicated that it "intended to
raise the minimum purchase percent threshold from a practice
percentage ranging 5-10 percent to 33 percent."  Pls.' Br. at 28;
Antidumping Methodologies: Market Economy Inputs, Expected Non-
Market Wages, Duty Drawback; and Request for Comments, 71 Fed.
Reg. 61716 (Oct 19, 2006).

[14]  Ningbo states that the white groupings did not exceed one
percent of MEP purchases, green tonnage did not exceed four
percent, and there were no invoices listing any other color. See
Pls.' Br. at 29.

economy currency (19 C.F.R. § 351.408(c)(1)) and that "[c]onsistent with this policy and 19 U.S.C. § 1677b(c)(1)" Commerce valued Ningbo's PET flake based on the "best available information." Commerce Br. at 18.  Commerce notes that "100 percent of Ningbo's PET flake purchases were market economy purchases, and therefore, [it] reasonably applied the market economy purchase prices." Id. at 19.  Commerce adds that "the fact that [it] applied facts available to value separately the specific costs of PET flake purchased does not render the policy inapplicable."  Id.  The Court agrees.

The fact that the MEP invoices did not in most cases specifically identify a color does not disqualify them as otherwise acceptable invoices reflecting MEPs.  Specifically, the invoices collectively account for far greater than five percent of the total volume of PET flakes purchased during the POI and the application of "facts available" to these invoices does not change this analysis.  Commerce's determination to value Ningbo's PET flake in this way is based on the "best available information" and supported by substantial evidence on the record.

V.   Commerce Requirements

Plaintiffs argue that Commerce failed to (1) establish the necessity for "alleged missing facts on the record" (i.e., color-specific costs for Ningbo's PET flake purchases); (2) advise

Ningbo Dafa of the deficiencies in its responses; and (3) justify why it was unable to use certain data submitted by Ningbo Dafa that met the criteria of the Tariff Act for its consideration. Pls.' Br. at 31. Ningbo contends that because Commerce did none of the above in its I&D Memo, that a remand is required.

The Court has addressed the reasonableness of Commerce requiring color-specific costs for Ningbo's PET flake purchases supra and therefore need not repeat its analysis here.

As to Commerce advising Ningbo of the deficiencies in responses, Commerce responds that it "complied with that statute by requesting that Ningbo [Dafa] report all of its factors of production in the initial questionnaire, and by continuing to request clarification of its market economy purchases of PET flake - including by color." Commerce Br. at 14. The Court agrees that these provide sufficient advisement to Ningbo under the law of the deficiencies in its responses.

Lastly, Ningbo's argument regarding Commerce's alleged lack of justification for its inability to use certain data submitted by Ningbo (i.e., the use of an average unit flake value) also revolves around the issue of Commerce requiring color-specific flake costs, which is addressed supra.

VI.  Additional Plaintiffs' Contentions

In its brief Ningbo also presents certain allegations

intimating a certain bias toward it in this investigation, among them that Ningbo was a "'marked' respondent from the commencement of the antidumping investigation" and that Commerce "cut its investigation short."  Pls.' Br. at 2, 11.  Although serious accusations, Ningbo does not offer much in the way of substantiating these charges.  The Court therefore will not address the specifics of these contentions but will note that the record does not support Ningbo as to these issues.

**CONCLUSION**

For the reasons stated above, Commerce's determination is affirmed and this case is dismissed.


                                    /s/ Nicholas Tsoucalas
                                    NICHOLAS TSOUCALAS
                                    SENIOR JUDGE



Dated:     September 2, 2008
           New York, New York