# United States Court of Appeals for the Federal Circuit

2009-1056

NINGBO DAFA CHEMICAL FIBER CO., LTD.,
CONSOLIDATED FIBERS, INC.,
FIBERTEX CORPORATION, and STEIN FIBERS, LTD.,

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Appellee,

and

DAK AMERICAS LLC
and NAN YA PLASTICS CORPORATION AMERICA,

Defendants-Appellees,

and

WELLMAN, INC.,

Defendant.

Gregory S. Menegaz, DeKieffer & Horgan, of Washington, DC, argued for plaintiffs-appellants Ningbo Dafa Chemical Fiber Co., Ltd., et al. With him on the brief was James K. Horgan.

Stephen C. Tosini, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee United States. With him on the brief were Michael F. Hertz, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director.

David C. Smith, Kelley Drye & Warren LLP, of Washington, DC, argued for defendants-appellees Dak Americas LLC, et al. With him on the brief was Paul C. Rosenthal.


Appealed from: United States Court of International Trade

Senior Judge Nicholas Tsoucalas

# United States Court of Appeals for the Federal Circuit

2009-1056

NINGBO DAFA CHEMICAL FIBER CO., LTD., CONSOLIDATED FIBERS, INC., FIBERTEX CORPORATION, and STEIN FIBERS, LTD.,

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Appellee,

and

DAK AMERICAS LLC and NAN YA PLASTICS CORPORATION AMERICA,

Defendants-Appellees,

and

WELLMAN, INC.,

Defendant.

Appeal from the United States Court of International Trade in case no. 07-00236, Senior Judge Nicholas Tsoucalas.

_____

DECIDED: September 2, 2009

_____

Before MICHEL, <u>Chief Judge</u>, LINN, <u>Circuit Judge</u>, and ST. EVE,[*] <u>District Judge</u>.

ST. EVE, <u>District Judge</u>.

---

[*] The Honorable Amy J. St. Eve, District Judge, United States District Court for the Northern District of Illinois, sitting by designation.

This appeal concerns an antidumping investigation of recycled polyester staple fiber ("PSF") from China. In its Final Determination from that investigation, the United States Department of Commerce ("Commerce") imposed a 4.86% antidumping duty on Ningbo Dafa Chemical Fiber Company, Ltd. ("Ningbo"). Certain Polyester Staple Fiber from the People's Republic of China, 72 Fed. Reg. 19,690 (Dep't of Commerce Apr. 19, 2007) ("Final Determination"). Ningbo, along with Consolidated Fibers, Inc., Fibertex Corporation, and Stein Fibers, Ltd., (collectively "Appellants") appeal from the judgment of the United States Court of International Trade affirming Commerce's Final Determination. See Ningbo Dafa Chem. Fiber Co. v. United States, 577 F. Supp. 2d 1304 (Ct. Int'l Trade 2008). Because Commerce's Final Determination was supported by substantial evidence and not contrary to law, we affirm.

## I. BACKGROUND

Ningbo is a Chinese manufacturer of PSF. Appellees DAK Americas LLC and Nan Ya Plastics Corporation America (collectively, the "Domestic Producers") are domestic PSF producers that petitioned Commerce to investigate whether imports of PSF from China had been "dumped"—sold at less than fair value—in the United States. Commerce is also an Appellee.

PSF is used as stuffing in consumer items such as sleeping bags, mattresses, pillows, comforters, and furniture. Ningbo manufactures PSF from recycled polyethylene terephthalate ("PET") bottle flake, often in the form of shredded used plastic bottles, such as soda bottles. PET flake constitutes nearly 100% by weight of the raw material used in Ningbo's production of recycled PSF. PET flake comes in a variety of colors, including white, green, and brown, and the color of PET flake used in

production determines the PSF's ultimate color. Thus, white PSF is made primarily from white PET flake, green PSF from green PET flake, and brown PSF from brown PET flake. In general, white is the most expensive PET flake color, followed by green and then brown. Similarly, once PET flake is processed into PSF, white PSF commands the highest prices, followed by green and then brown. During the period of investigation here, Ningbo produced approximately 60% white PSF, 32% green PSF, and 8% brown PSF. At issue is whether Commerce properly relied on Ningbo's PET flake invoices in determining Ningbo's antidumping margin.

In 2006, Commerce commenced an investigation into whether Chinese-manufactured PSF was, or was likely to be, sold in violation of United States policy against the dumping of goods. "The statutory definition of 'dumping' is the 'sale or likely sale of goods at less than fair value.'" SKF USA, Inc. v. U.S. Customs & Border Prot., 556 F.3d 1337, 1340 (Fed. Cir. 2009) (quoting 19 U.S.C. § 1677(34) (2006)). Commerce assesses antidumping duties on the basis of a "dumping margin"—the amount by which the calculated "normal value" of subject merchandise exceeds its export price. 19 U.S.C. § 1677(35)(A).

In antidumping investigations of merchandise produced in either market economy or nonmarket economy countries, § 1677b(a) prescribes Commerce's default methods for calculating normal value. See id. § 1677b(a). Very often, however, Commerce is unable to calculate normal value using the general framework of subsection (a). For nonmarket economy ("NME") countries, such as China, Commerce must then apply § 1677b(c)(1)—the "factors of production" methodology—to calculate the normal value of merchandise produced in such countries:

**(1) In general**

If—

> **(A)** the subject merchandise is exported from a nonmarket economy country, and

> **(B)** the administering authority finds that available information does not permit the normal value of the subject merchandise to be determined under subsection (a) of this section,

the administering authority shall determine the normal value of the subject merchandise on the basis of the value of the factors of production utilized in producing the merchandise . . . . Except as provided in paragraph (2), the valuation of the factors of production shall be based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority.

Id. § 1677b(c)(1).[1]  Thus, pursuant to § 1677b(c)(1), Commerce bases its valuation of factors of production on the "best available information" of their values in a market economy country.  In a "factors of production" analysis, Commerce considers purchases from market economy suppliers the most reliable evidence of an input's value.  Consequently, "where a factor is purchased from a market economy supplier and paid for in a market economy currency, [Commerce] normally will use the price paid to the market economy supplier [to value that factor]."  19 C.F.R. § 351.408(c)(1) (2009).

Pursuant to that policy, Commerce requested the invoices from Ningbo's market economy PET flake purchases during the period of investigation.  Commerce

---

[1]     The exception in "paragraph (2)" to which § 1677b(c)(1) refers (i.e., § 1677b(c)(2)) provides that, if Commerce finds that the "available information is inadequate for purposes of determining the normal value of subject merchandise under paragraph (1)"—the factors of production methodology—Commerce shall determine normal value based on the price for which similar merchandise produced in comparable market economy countries is sold in other countries, including the United States.  19 U.S.C. § 1677b(c)(2); Allied Pac. Food (Dalian) Co. v. United States, 587 F. Supp. 2d 1330, 1353 n.11 (Ct. Int'l Trade 2008).  Commerce did not apply that exception here.

determined that color-specific PET flake values were needed to accurately calculate Ningbo's dumping margin because the cost of PET flake varies based on color and Ningbo's prices for finished PSF concomitantly vary based on the color of PET flake used during production. Commerce thus asked Ningbo to identify, by color, the quantities and values of its market economy purchases of PET flake.

Ningbo supplied Commerce with fifty-eight invoices from its qualified market economy purchases of PET flake from the period of investigation, but only a few of those invoices identified the specific color of PET flake purchased. Specifically, three of Ningbo's market economy invoices specified white PET flake purchases, and five specified green PET flake purchases. None of Ningbo's market economy invoices indicated a purchase of brown PET flakes. Thereafter, Commerce again requested that Ningbo provide information regarding the quantities and values of its market economy purchases of PET flake segregated by color. Despite Commerce's repeated requests, however, Ningbo did not supply Commerce with complete market economy PET flake purchase prices based on color or its usage ratios based on color because, according to Ningbo, it did not maintain such records in the ordinary course of business. Because Ningbo did not provide the complete requested information on its most significant raw material, Commerce invoked 19 U.S.C. § 1677e(a)(2)(B) in its Final Determination and applied neutral partial "facts available" to calculate color-specific values for Ningbo's PET flake. Final Determination, 72 Fed. Reg. at 19,691.

Section 1677e(a)—the "facts otherwise available" or "facts available" provision—provides in relevant part:

If—

**(1)** necessary information is not available on the record, or

**(2)** an interested party or any other person—

> **(A)** withholds information that has been requested by the administering authority or the Commission under this subtitle, [or]

> **(B)** fails to provide such information by the deadlines for submission of the information or in the form and manner requested, subject to subsections (c)(1) and (e) of section 1677m of this title,

> . . .

the administering authority and the Commission shall, subject to section 1677m(d)[2] of this title, use the facts otherwise available in reaching the applicable determination under this subtitle.

19 U.S.C. § 1677e(a). Subsection (c)(1) of § 1677m provides that, if an interested party promptly notifies Commerce that it is unable to submit the information in the requested form and manner, together with a full explanation and suggested alternative forms in which it is can submit the information, Commerce shall consider the party's ability to

---

[2]    Section 1677m(d) provides:

If the administering authority . . . determines that a response to a request for information under this subtitle does not comply with the request, the administering authority . . . shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency in light of the time limits established for the completion of investigations or reviews under this subtitle. If that person submits further information in response to such deficiency and either—

> (1) the administering authority . . . finds that such response is not satisfactory, or

> (2) such response is not submitted within the applicable time limits,

then the administering authority . . . may, subject to subsection (e) of this section, disregard all or part of the original and subsequent responses.

19 U.S.C. § 1677m(d). Ningbo does not contest that Commerce complied with § 1677m(d) in this case.

submit the information in the requested form and manner and may modify such requirements to the extent necessary to avoid imposing an unreasonable burden on the party. Id. § 1677m(c)(1).

When § 1677e(a) applies, Commerce may use as "facts available" any "information or inferences which are reasonable to use under the circumstances" to make the applicable determination or substitute for the missing information. See Statement of Administrative Action, H.R. Rep. No. 103-316, at 869 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4198; Nippon Steel Corp. v. United States, 25 C.I.T. 1192, 1196 (Ct. Int'l Trade 2001). In addition, § 1677e(b) authorizes Commerce to draw adverse inferences from the facts available when it concludes that a party "failed to cooperate by not acting to the best of its ability" in supplying the requested information. 19 U.S.C. § 1677e(b).

As already discussed, Commerce requested color-specific PET flake prices because it determined they were important to accurately calculate the normal value of Ningbo's PSF products, and thus the applicable antidumping margin. When Ningbo did not provide color-specific PET flake values, Commerce concluded that Ningbo did not provide the requested information in the form and manner requested, thus justifying application of the "facts otherwise available" under 19 U.S.C. § 1677e(a): "For this final determination, in accordance with [§ 1677e(a)(2)(B) and § 1677m(c)(1)], we have determined that the use of neutral facts available is appropriate for Ningbo Dafa's PET flake." Final Determination, 72 Fed. Reg. at 19,691. Commerce applied neutral, rather than adverse, partial facts available. Id. Specifically, Commerce used those invoices that indicated white and green to extrapolate the value of Ningbo's white and green PET

flake, respectively. Commerce then assigned the color brown to the remaining market economy purchases reflected in approximately fifty invoices—those which did not indicate a color—and used the average price from those invoices as the value of Ningbo's brown PET flake. Relying on the incomplete information contained in Ningbo's color-specific market economy invoices, Commerce assigned Ningbo an antidumping duty margin of 4.86%. Although imperfect, it was the only color-specific evidence Ningbo provided.

The Court of International Trade affirmed Commerce's final determination in all respects. Ningbo Dafa, 577 F. Supp. 2d 1304. This appeal followed. The Federal Circuit has jurisdiction over appeals from the Court of International Trade pursuant to 28 U.S.C. § 1295(a)(5).

## II. DISCUSSION

### A. Standard of Review

"The Federal Circuit reviews Commerce's anti-dumping orders using the same standard of review used by the Court of International Trade." NMB Singapore Ltd. v. United States, 557 F.3d 1316, 1319 (Fed. Cir. 2009); NSK Ltd. v. United States, 481 F.3d 1355, 1359 (Fed. Cir. 2007). This court upholds Commerce's decisions unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); NMB Singapore, 557 F.3d at 1319; Timken U.S. Corp. v. United States, 434 F.3d 1345, 1350 (Fed. Cir. 2006). "Substantial evidence means 'more than a mere scintilla' and 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Huvis Corp. v. United States, 570 F.3d 1347, 1351 (Fed. Cir. 2009) (quoting Consol. Edison Co. v.

NLRB, 305 U.S. 197, 229 (1938)); SKF USA, Inc. v. United States, 537 F.3d 1373, 1378 (Fed. Cir. 2008); Inland Steel Indus., Inc. v. United States, 188 F.3d 1349, 1359 (Fed. Cir. 1999). The "substantiality of evidence must take into account whatever in the record fairly detracts from its weight, including contradictory evidence or evidence from which conflicting inferences could be drawn." Huvis, 570 F.3d at 1351 (internal quotation marks omitted). Though decisions of the Court of International Trade affirming or reversing final administrative determinations are reviewed de novo, "'we give great weight to the informed opinion of the Court of International Trade . . . , [and] it is nearly always the starting point of our analysis.'" Id. (alteration and omission in original) (quoting Nippon Steel Corp. v. United States, 458 F.3d 1345, 1351 (Fed. Cir. 2006)).

"We review de novo whether Commerce's interpretation of a governing statutory provision is in accordance with law, but we do so within the framework established by Chevron . . . ." Agro Dutch Indus. Ltd. v. United States, 508 F.3d 1024, 1029–30 (Fed. Cir. 2007); see Elkem Metals Co. v. United States, 468 F.3d 795, 800 (Fed. Cir. 2006). The first step of the Chevron analysis is to determine "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842–43 (1984); FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 132 (2000); Agro Dutch, 508 F.3d at 1030. "Under step two of Chevron, if an agency's statutory interpretation promulgated under the authority delegated it by Congress is 'reasonable' it is 'binding [o]n the courts unless procedurally

defective, arbitrary or capricious in substance, or manifestly contrary to the statute.'" Wheatland Tube Co. v. United States, 495 F.3d 1355, 1360 (Fed. Cir. 2007) (alteration in original) (quoting Chevron, 467 U.S. at 844; Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (D)).

## B.     Application of "Facts Available" in Nonmarket Economy Cases

As noted above, because complete color-specific PET flake information was not available, Commerce resorted to "facts otherwise available" under 19 U.S.C. § 1677e(a) to calculate color-specific values for Ningbo's PET flake.  Ningbo argues that § 1677b(c)(1)'s "best available information" standard—on which Commerce "shall" base the valuation of the factors of production for merchandise exported from a NME country—bars Commerce from invoking facts available under § 1677e(a) when valuing factors of production.  Thus, according to Ningbo, Commerce acted "contrary to law" by applying "facts available" in this NME case.  The court disagrees.

### 1.     Plain Language of 19 U.S.C. § 1677b(c)(1) and § 1677e(a)

This appeal revolves, in part, around the proper interpretation and interaction of 19 U.S.C. § 1677b(c)(1) and § 1677e(a).  Both § 1677b and § 1677e are found in Subtitle IV of Title 19 of the United States Code.  Section 1677b(c)(1) provides that in NME investigations, Commerce "shall" use the "best available information regarding the values of such factors [of production]."  Section 1677e(a) specifically provides: "If . . . (1) necessary information is not available on the record, or (2) an interested party or any other person . . . fails to provide such information . . . in the form and manner requested," Commerce "shall . . . use the facts otherwise available in reaching the applicable determination under this subtitle."  19 U.S.C. § 1677e(a) (emphasis added);

2009-1056                                    10

Huvis, 570 F.3d at 1349. Accordingly, under § 1677e(a), where necessary information is unavailable on the record or a party fails to provide requested information, Commerce "shall" use the "facts otherwise available" to fill information gaps when determining the value of the factors of production under § 1677b(c)(1) using the "best available information." See Nippon Steel Corp. v. United States, 337 F.3d 1373, 1381 (Fed. Cir. 2003) ("Under subsection (a) [of 19 U.S.C. § 1677e], if a respondent 'fails to provide [requested] information by the deadlines for submission,' Commerce shall fill in the gaps with 'facts otherwise available.' The focus of subsection (a) is respondent's failure to provide information. The reason for the failure is of no moment. The mere failure of a respondent to furnish requested information—for any reason—requires Commerce to resort to other sources of information to complete the factual record on which it makes its determination." (second alteration in original)); Merck & Co. v. Hi-Tech Pharmacal Co., 482 F.3d 1317, 1322 (Fed. Cir. 2007) ("Use of the word 'shall' in a statute generally denotes the imperative."); Grav v. United States, 886 F.2d 1305, 1307 (Fed. Cir. 1989) (noting that use of the word "shall" indicates the action is mandatory).

Nor does the plain language of § 1677b(c)(2) preclude application of § 1677e(a)'s "facts otherwise available" to valuations of NME merchandise. Section 1677b(c)(2) provides an "exception" in NME cases where information, though "available," is nevertheless "inadequate" to calculate the normal value of subject merchandise. 19 U.S.C. § 1677b(c)(2) ("available information is inadequate"). Section 1677e(a), in contrast, applies when necessary information is "not available on the record" or where a party withholds or fails to provide requested information. There is nothing in the statutory text to indicate that the "exception" in § 1677b(c)(2) was meant

to serve as Commerce's exclusive recourse in situations where information is in some way deficient in a NME investigation. The court's plain language reading is further confirmed and strengthened by legislative history as well as the deference due to agency interpretations of their governing statutes.

### 2. Legislative History

Contrary to Ningbo's contentions, the plain language of these statutory provisions empowers Commerce to resort, in certain circumstances, to "facts available" in NME cases. "If the statute is clear and unambiguous on its face, as is the case here, 'there is usually no need to resort to the legislative history underlying the statute.'" Ortiz v. Principi, 274 F.3d 1361, 1364 (Fed. Cir. 2001) (quoting Munson v. Merit Sys. Prot. Bd., 216 F.3d 1037, 1040 (Fed. Cir. 2000)); see Garcia v. United States, 469 U.S. 70, 75 (1984) ("[O]nly the most extraordinary showing of contrary intentions from [the legislative history] would justify a limitation on the 'plain meaning' of the statutory language."); Mudge v. United States, 308 F.3d 1220, 1230 (Fed. Cir. 2002). Nonetheless, the legislative history of the Uruguay Round Agreements Act ("URAA"), Pub. L. No. 103-465, 108 Stat. 4809 (1994), which codified the current version of § 1677e(a),[3] reinforces the court's reading of the plain language of these provisions. See United States v. Wells, 519 U.S. 482, 492 (1997) (proceeding to note that the legislative history was consistent with the Court's interpretation of the statute's plain and

---

[3]     Prior to the URAA, § 1677e(a) "mandated the use of the 'best information [otherwise] available' if a respondent refused or was unable to produce information in a timely manner or in the form requested by Commerce." Nippon Steel, 337 F.3d at 1381. Apparently, the change to "facts otherwise available" was one in terminology only and was intended to incorporate prevailing practice. See Statement of Administrative Action, H.R. Rep. No. 103-316, at 869, reprinted in 1994 U.S.C.C.A.N. at 4198 ("The [Uruguay Round Agreements] largely track current law, but use different terminology.").

unambiguous text); Merck, 482 F.3d at 1322. The Statement of Administrative Action ("SAA") accompanying the URAA is, by statute, "an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application." 19 U.S.C. § 3512(d); see Timken U.S. Corp. v. United States, 421 F.3d 1350, 1354 n.2 (Fed. Cir. 2005). The SAA provides that the "facts otherwise available" provision is intended to permit Commerce to "fill[] gaps in the record." See Statement of Administrative Action, H.R. Rep. No. 103-316, at 869, reprinted in 1994 U.S.C.C.A.N. at 4198–99 (explaining that 19 U.S.C. § 1677e(a) "generally will require Commerce to reach a determination by filling gaps in the record due to deficient submissions or other causes").

The legislative history of the URAA thus reveals that Congress intended § 1677e(a) to provide Commerce with gap-filling power to facilitate its implementation of the antidumping laws. Ningbo has not identified any support in the legislative history or case law, and the court has found none, for its position that, despite § 1677e(a)'s mandatory language and express applicability to Commerce's determinations under the same subtitle, Commerce cannot resort to facts available in NME cases.

### 3. Deference to Commerce's Interpretation of Governing Statutes

Because Congress's intent as to the interaction of § 1677b(c)(1) and § 1677e(a) is clear from the plain language of these statutes, the court need not determine whether Commerce's interpretation warrants Chevron deference. See Chevron, 467 U.S. at 842–43; Wheatland Tube, 495 F.3d at 1359. In the interest of completeness, however, the court will address the Chevron analysis. If ambiguity existed, Chevron obligates the

court to defer to Commerce's reasonable interpretations of its governing statutes, such as § 1677b and § 1677e.  See SKF USA, 537 F.3d at 1379.

It is "well established that 'statutory interpretations articulated by Commerce during its antidumping proceedings are entitled to judicial deference under Chevron.'" Agro Dutch, 508 F.3d at 1029 n.4 (quoting Pesquera Mares Australes Ltda. v. United States, 266 F.3d 1372, 1382 (Fed. Cir. 2001)); Thai Pineapple Canning Indus. Corp. v. United States, 273 F.3d 1077, 1083 (Fed. Cir. 2001).  Although not in an identical case, Commerce has invoked its § 1677e(a) "facts available" authority in other NME cases. See, e.g., Polyethylene Retail Carrier Bag Comm. v. United States, 232 F. App'x 965, 968–69 (Fed. Cir. 2007) (nonprecedential); Shandong Huarong Gen. Group Corp. v. United States, 27 C.I.T. 1568, 1596 (Ct. Int'l Trade 2003) ("Commerce has exercised this ability [to apply partial adverse facts available] in the context of NME investigations.").  These cases, as well as its position in this case, confirm that Commerce interprets 19 U.S.C. § 1677e(a) to apply, where appropriate, to NME investigations.

Further, "this court gives Commerce's interpretation of antidumping laws significant deference because of its special expertise in administering antidumping duty law."  Wheatland Tube, 495 F.3d at 1361.  Indeed, "'[d]eference to an agency's interpretation is at its peak in the case of a court's review of Commerce's interpretation of the antidumping laws.'"  SKF USA, 537 F.3d at 1379 (quoting Koyo Seiko Co. v. United States, 36 F.3d 1565, 1570 (Fed. Cir. 1994)).  The court's conclusion that "facts available" can apply when valuing factors of production in NME cases is further strengthened by the "considerable deference" due to Commerce's interpretation of the

antidumping statutes.  See Micron Tech., Inc. v. United States, 243 F.3d 1301, 1312 (Fed. Cir. 2001); cf. Chen v. Mukasey, 524 F.3d 1028, 1032 (9th Cir. 2008) ("Because the statute is silent on the interaction between the two provisions at issue, we must defer to the agency as long as its interpretation is reasonable.").

In order to affirm Commerce's determination here, however, it is not enough that the law permits Commerce to apply "facts available" in valuing factors of production. Commerce's decision to do so also must be supported by substantial evidence.  In addition, substantial evidence must support Commerce's color-specific PET flake valuations.

## C. Substantial Evidence Supports Commerce's Resort to "Facts Available"

Ningbo's argument that Commerce should have relied on a single, non-color-specific PET flake value as the best available information is unavailing.  In the supporting memorandum to its Final Determination, Commerce explained:

> [T]here is a direct relation between the sale price of PSF and the color of PET flake price used to produce PSF (i.e., generally, white PET flake is more expensive than green PET flake, and therefore, generally, the sale price of white PSF is greater than that of green PSF). . . .  Therefore, in order to accurately calculate dumping margins in this case, it is important to make identical or similar comparisons between the sales of a specific color of finished PSF and the normal value based on the color of PET flake used to produce the PSF.  Thus, the Department requested that Ningbo Dafa report its usage ratios of PET flake based on color and its market economy purchase prices of PET flake based on color.

Investigation of Certain Polyester Staple Fiber from the People's Republic of China: Issues & Decision Mem. at 61 (Dep't of Commerce Apr. 10, 2007).  Thus, substantial evidence, including the color-based relationship between PET flake cost and PSF price, supports Commerce's conclusion that it required color-specific PET flake values to accurately calculate Ningbo's dumping margin.  Ningbo did not provide complete color-

specific PET flake information.  Accordingly, Ningbo's failure "to provide information in the form and manner requested by [Commerce]" and failure to "suggest alternative forms in which it was able to submit the requested information," id., forced Commerce to apply the "facts otherwise available" to determine color-specific PET flake values. Resorting to the "facts available"—namely, verified invoices from Ningbo's actual market economy purchases—Commerce properly relied on incomplete color-specific and non-color-specific invoices to calculate color-specific PET flake values.

"In determining the valuation of the factors of production, the critical question is whether the methodology used by Commerce is based on the best available information and establishes antidumping margins as accurately as possible." Shakeproof Assembly Components v. United States, 268 F.3d 1376, 1382 (Fed. Cir. 2001); Parkdale Int'l v. United States, 475 F.3d 1375, 1380 (Fed. Cir. 2007).  "While § 1677b(c) provides guidelines to assist Commerce in this process, this section also accords Commerce wide discretion in the valuation of factors of production in the application of those guidelines." Shakeproof, 268 F.3d at 1381 (quoting Nation Ford Chem. Co. v. United States, 166 F.3d 1373, 1377 (Fed. Cir. 1999)); see Lasko Metal Prods., Inc. v. United States, 43 F.3d 1442, 1446 (Fed. Cir. 1994).  In the context of § 1677b(c), where a party fails to provide requested information or certain necessary information is wholly absent from the record, such that no "best" information exists as to a particular factor of production, Commerce can resort to the general, gap-filling "facts available" authority conferred by § 1677e(a).  See Shandong Huarang Gen. Group Corp. v. United States, 60 F. App'x 797, 799–800 (Fed. Cir. 2003) (nonprecedential) (concluding that, although Commerce's determination must be based on "the best available information," where a

respondent did not provide sufficient information, Commerce made a reasonable determination based on the available information). Commerce may be able to identify the "best" information among that available to it, but requiring Commerce to do so does not ensure that the available record information includes the information Commerce needs to fulfill its responsibility to calculate antidumping margins "as accurately as possible" under § 1677b(c). Shakeproof, 268 F.3d at 1382. Section 1677e(a) is secondary to, but nonetheless supplements, § 1677b(c)(1).

Here, no information was available as to the specific value of brown PET flake— none of Ningbo's market economy invoices indicated brown, and color-specific Indian surrogate values did not exist. Thus, having permissibly determined that color-specific PET flake values were important to an accurate margin calculation, Commerce followed its longstanding policy that market economy prices are the "best available information" under 19 U.S.C. § 1677b(c)(1) and relied on the prices from Ningbo's market economy invoices to value PET flake.[4] Commerce resorted to partial "facts available" under 19

_____

[4]     Pursuant to established policy, Commerce considers average ME purchase price the "best available information" to value a given input as long as the volume of the input purchased from ME suppliers as a share of total purchases of that input is "meaningful." Antidumping Methodologies, 71 Fed. Reg. 61,716, 61,716 (Dep't of Commerce Oct. 19, 2006) (request for comment). Ningbo argues that Commerce departed from its then-governing policy to rely on market economy invoices to value a factor of production only when such invoices represented at least 5% of a respondent's total volume of purchases during the period of investigation. Ningbo argues that, even under the 5% policy, the market economy invoices upon which Commerce relied here constituted only 1.6% of just the total market economy flake purchases during the POI. The government responds that Ningbo's market economy purchases were well over 5% of the total volume of PET flake purchased. Commerce's treatment of white and green PSF as distinct products must fairly extend to its treatment of each product's unique inputs. The record does not permit the necessary comparison, however, because Ningbo did not report the total amount of white or green PET flake it purchased from all sources during the POI. Nevertheless, Commerce is required to explain deviations from policy. Huvis, 570 F.3d at 1353. On the other hand, if Commerce's reliance on this

U.S.C. § 1677e(a) for the necessary information that was missing from the record, but did so in accordance with the "best available information" mandate of § 1677b(c)(1). See NSK Ltd. v. United States, 358 F. Supp. 2d 1276, 1290 (Ct. Int'l Trade 2005) ("By its nature, a 'facts available' analysis necessarily implies that Commerce used facts where the actual facts are an insufficient basis for a complete analysis.").

**D.     Commerce's Valuation of Ningbo's PET Flake Factor of Production**

Having determined that Commerce properly relied on the "facts otherwise available" to value Ningbo's PET flake purchases by color, the court must next consider whether Commerce's application of the facts available was reasonable and supported by substantial evidence.[5]     Indeed, the invocation of "facts available" does not alter the court's mandate to ensure that Commerce's determinations and methodology are supported by substantial evidence.  See NTN Bearing Corp. v. United States, 368 F.3d 1369, 1377 (Fed. Cir. 2004) (evaluating Commerce's facts available methodology for substantial evidentiary support); Ta Chen Stainless Steel Pipe, Inc. v. United States, 298 F.3d 1330, 1335 (Fed. Cir. 2002) (applying substantial evidence standard to Commerce's imposition of adverse facts available); Nippon Steel, 25 C.I.T. at 1196

small sample of ME invoices to value white and green PET flake was based not on the best available information, as its brief before this court suggests, but on partial "facts available," as the Final Determination implies, the 5% policy may not apply.  The court need not decide this issue to resolve this appeal.

[5]     In an apparent attempt to lower the court's standard of review, the Domestic Producers note that the SAA provides that "facts available" need only be those "reasonable to use under the circumstances."  Statement of Administrative Action, H.R. Rep. No. 103-316, at 869, reprinted in 1994 U.S.C.C.A.N. at 4198.  Semantics aside, this court's review is governed by statute, pursuant to which the court will affirm Commerce's calculated color-specific PET flake values if they are supported by "substantial evidence on the record" and otherwise in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i); see SKF USA, 537 F.3d at 1378 (concluding that the trade court's reasonableness-focused inquiry did not conflict with our controlling "substantial evidence" standard).

("Commerce may thus employ record evidence to arrive at a margin calculation in the absence of complete data, even if the evidence does not necessarily replace the precise data missing, subject to the constraint that the facts and the manner in which they are employed are reasonable.").

Ningbo argues that Commerce's methodology for allocating the "facts available" market economy invoices to value its PET flake by color was not supported by substantial evidence because it did not match its actual production experience. Ningbo contends that "a reasonable investigator would have assigned the color white to the invoices (the top 60%) with the highest unit values; and would have assigned the color green to the unknown color invoices in the middle of the unit value range (the next 32%); and the remainder (approximately 8%) to brown." Appellant's Br. 47.

The government argues that, as a threshold matter, this court cannot consider Ningbo's argument that Commerce should have calculated color-specific PET flake values according to Ningbo's period-of-investigation production of finished PSF because Ningbo failed to exhaust its administrative remedies with respect to that argument. The government and the Domestic Producers further assert that Commerce's determinations, including its calculation of "facts available" color-specific PET flake values, are supported by substantial evidence and not contrary to law.

### 1. Exhaustion of Administrative Remedies

According to the government, prior to briefing before the Court of International Trade, Ningbo had never suggested allocating its non-color-specific market economy invoices based on its color-specific production ratios. Nor, the government adds, did Ningbo present the production-based invoice allocations and calculations to which it

now points. The government concludes that the court cannot consider Ningbo's production-based arguments because Ningbo did not exhaust its administrative remedies by presenting them to Commerce during the investigation.

The Court of International Trade "shall, where appropriate, require the exhaustion of administrative remedies." 28 U.S.C. § 2637(d). This court has "held that applying exhaustion principles in trade cases is subject to the discretion of the judge of the Court of International Trade." Corus Staal BV v. United States, 502 F.3d 1370, 1381 (Fed. Cir. 2007). Here, the Court of International Trade concluded that "the record does not indicate a clearly better method for valuation than the one used by Commerce." Ningbo Dafa, 577 F. Supp. 2d at 1312. Addressing Commerce's exhaustion argument, however, that court stated that it "d[id] not agree with Commerce's stance" that Commerce lacked an opportunity to consider Ningbo's production and sales numbers as an alternative methodology. Id. at 1311. Indeed, Commerce verified Ningbo's color-specific production quantities during the investigation, and the government confirmed at oral argument that Commerce was aware of Ningbo's actual production data. Moreover, the record before Commerce contained at least a suggestion, incorporated in Ningbo's internal cost allocation, of a production-based allocation methodology. Accordingly, the Court of International Trade did not abuse its discretion in finding that Commerce had the opportunity to consider a production-based methodology. See Corus Staal, 502 F.3d at 1381. The court, therefore, will consider Ningbo's arguments on the merits.

## 2. Substantial Evidence Supports Commerce's Determinations

"Commerce is the 'master of antidumping law,' and reviewing courts must accord deference to the agency in its selection and development of proper methodologies." Thai Pineapple Pub. Co. v. United States, 187 F.3d 1362, 1365 (Fed Cir. 1999). In fact, the "methodologies relied upon by Commerce in making its determinations are presumptively correct." Id.; Fla. Citrus Mut. v. United States, 550 F.3d 1105, 1110 (Fed. Cir. 2008). Even when Commerce makes "adverse inferences" in connection with its reliance on "facts otherwise available," however, Commerce cannot "overreach reality" in imposing a dumping margin in the name of maximizing deterrence. See Ta Chen, 298 F.3d at 1340; Huvis, 570 F.3d at 1353 ("Even when Commerce uses adverse inferences [which it did not in Huvis], it must use a reasonably accurate estimate of the respondent's actual rate when using 'facts available.'" (internal quotation marks omitted)). This limitation holds especially true where, as here, Commerce concluded that adverse inferences were not warranted.

### a. Commerce's Color-Specific Valuation Methodology

The court disagrees with Ningbo's argument that Commerce's methodology for calculating color-specific PET flake values was demonstrably distortive and inaccurate. Ningbo asserts that Commerce made unrealistic assumptions about Ningbo's PET flake purchases, out of proportion to Ningbo's verified period-of-investigation production ratios contained in the record before Commerce. Ningbo argues that it would have been impossible for it to produce the amount of each color of PSF it actually produced if it had in fact purchased the amount of white and green PET flake assumed by Commerce. Ningbo further contends that any reasonable alternative values for its PET

flake purchases, such as the values derived from allocating the non-color-specific invoices in rough proportion to the colors of its PSF production, would result in a de minimis or negative margin, for which no duty would be assessed.

In support of its position, Ningbo points out that Commerce relied on three invoices representing 0.41% by weight of Ningbo's total market economy flake purchases during the period of investigation to value Ningbo's white PET flake, even though finished PSF is almost entirely PET flake, the color of PET flake used in production dictates the color of the finished PSF, and 60% of Ningbo's flake consumption was for production of white PSF. Similarly, the five invoices which identified the flake color as green represented 1.2% of Ningbo's market economy flake purchases, yet the production of green PSF accounted for 32% of flake consumption. Commerce then assumed that the remaining 95% of market economy flake purchases during the period of investigation, for which the invoices did not identify a color, were purchases of brown flake. Only 8% of Ningbo's PSF production during the period of investigation, however, was brown. Thus, as Ningbo puts it, Commerce averaged the prices of 95% by weight of Ningbo's market economy PET flake purchases to value the input that constituted approximately 8% of the product. Moreover, the record reveals that although Ningbo purchased PET flake from a number of market economy suppliers, all the color-indicating invoices were from a single supplier. Pointing to this record evidence, Ningbo concludes that Commerce assumed unrealistic facts and, as a result of failing to allocate an appropriate proportion of purchases to white and green flake, unreasonably overstated the value of all three flake colors.

Despite some conflicting evidence, the following substantial record evidence supports Commerce's allocation methodology. To begin, as the Domestic Producers point out, the factors of production methodology focuses on input purchases, not production, and the record reveals that Ningbo purchased materially less PET flake during the period of investigation than it consumed during the period. Ningbo also had two to three months inventory of PET flake on hand. Moreover, according to Ningbo, the market economy invoices upon which Commerce relied represented only 40% of its total flake purchases during the period of investigation. That is, Ningbo's flake purchases from other countries—constituting 60% of its purchases during the period of investigation—were not reflected in Commerce's methodology. In sum, no exact correlation between Ningbo's market economy flake purchases and production was possible given the lack of information provided by Ningbo. As already discussed, although Commerce may have had the opportunity to consider Ningbo's production quantities, despite Commerce's clear requests, Ningbo did not provide its PET flake usage ratios based on color or an alternative means for determining the color of its market economy PET flake purchases. Accordingly, Commerce, working with the incomplete information before it, reasonably and realistically assigned a color to the market economy invoices without stated colors. In light of the broad discretion Commerce enjoys in valuing factors of production, see Nation Ford, 166 F.3d at 1377, Commerce's methodology for valuing white, green, and brown PET flake based on the invoices from Ningbo's market economy purchases is supported by substantial evidence and in accordance with law.

### b. Commerce's Color-Specific Valuations of Ningbo's PET Flake

As indicated above, Ningbo also argues that Commerce diverted invoices fairly attributable to white and green PET flake and added them to the average for brown, the least expensive PET flake. In support, Ningbo points to the following verified facts suggesting that the actual cost of white flake was lower than Commerce's constructed value: (1) the invoices Commerce relied on to value white PET flake reflected the highest cost PET flake Ningbo purchased during the period of investigation; (2) Ningbo's PSF production is 60% white PSF; (3) white PSF is made almost entirely from white PET flake; and (4) the amount of white PET flake reflected by the white-indicating invoices was significantly less than required to produce the amount of white PSF Ningbo actually manufactured during the period of investigation. Consequently, non-color-specific invoices from purchases of relatively lower-priced white PET flake were necessarily excluded from Commerce's calculation. Ningbo reasons that Commerce's constructed color-specific PET flake valuations are thus clearly and demonstrably inaccurate. The court disagrees.

Despite some evidence detracting from its weight, substantial record evidence supports Commerce's valuations. To begin, for the reasons discussed above, no exact correlation between Ningbo's PET flake purchases and PSF production is possible based on the incomplete information on the record. Commerce's constructed prices for white, green, and brown PET flake (which are confidential) approximate the relative price differences between white and green and white and brown PET flake that Ningbo employees reported to Commerce during its verification visit. Moreover, Commerce's calculated values are identical to the prices derived from co-respondent Cixi

Jiangnan's[6] color-specific market economy invoices and are comparable to the prices listed in Ningbo's internal inventory allocation chart from one month during the period of investigation. Although Cixi's prices were for <u>washed</u> PET flake, while Ningbo purchased only less expensive, <u>unwashed</u> flake, this evidence is nonetheless more than a mere scintilla supporting Commerce's valuations. Finally and most significantly, as the Court of International Trade found, Ningbo has not demonstrated that Commerce's constructed prices resulted in higher dumping margins than if Ningbo had provided actual PET flake purchases by color. <u>See</u> <u>Ningbo Dafa</u>, 577 F. Supp. 2d at 1311. In sum, Commerce's determination appears to reflect a reasonable approximation in light of Ningbo's actual record keeping.

Substantial evidence is a deferential standard of review, which requires only that a determination be supported by "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>SKF USA</u>, 537 F.3d at 1378 (quoting <u>Consol. Edison</u>, 305 U.S. at 229). Commerce's methodology and resulting color-specific PET flake valuations, while not perfect, are supported by substantial evidence.

### III. CONCLUSION

For the aforementioned reasons, we affirm the judgment of the Court of International Trade affirming Commerce's determinations as to Ningbo.

<u>AFFIRMED</u>.

---

[6] Like Ningbo, its cross-town rival, Cixi Jiangnan is a Chinese producer of recycled PSF.