# United States Court of Appeals for the Federal Circuit

---

**AMERICAN TUBULAR PRODUCTS, LLC, JIANGSU CHENGDE STEEL TUBE SHARE CO., LTD.,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES, UNITED STATES STEEL CORPORATION, TMK IPSCO, WHEATLAND TUBE COMPANY, V & M STAR L.P.,**
*Defendants-Appellees*

---

2016-1127

---

Appeal from the United States Court of International Trade in No. 1:13-cv-00029-RWG, Senior Judge Richard W. Goldberg.

---

Decided: February 13, 2017

---

DONALD CAMERON, JR., Morris, Manning & Martin, LLP, Washington, DC, for plaintiffs-appellants. Also represented by MARY HODGINS, JULIE MENDOZA, BRADY MILLS, R. WILL PLANERT, SARAH SUZANNE SPRINKLE.

LOREN MISHA PREHEIM, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee United States. Also represented by BENJAMIN C. MIZER,

JEANNE E. DAVIDSON, CLAUDIA BURKE; WHITNEY MARIE ROLIG, Office of the Chief Counsel for Trade Enforcement and Compliance, United States Department of Commerce, Washington, DC.

PHILIP CHARLES STERNHELL, Quinn Emanuel Urquhart & Sullivan, LLP, Washington, DC, argued for defendant-appellee United States Steel Corporation. Also represented by DEBBIE LEILANI SHON, JONATHAN GORDON COOPER, JON DAVID COREY, KELSEY RULE.

ROGER BRIAN SCHAGRIN, Schagrin Associates, Washington, DC, for defendants-appellees TMK IPSCO, Wheatland Tube Company, V & M Star L.P. Also represented by JOHN W. BOHN, JORDAN CHARLES KAHN.

————————————

Before NEWMAN, MAYER, and LOURIE, *Circuit Judges*.

LOURIE, *Circuit Judge*.

American Tubular Products, LLC ("ATP") and Jiangsu Chengde Steel Tube Share Co., Ltd. ("Chengde") (collectively, "the Appellants") appeal from the decisions of the United States Court of International Trade ("the Trade Court") affirming the Department of Commerce's ("Commerce") antidumping duty calculations in the first administrative review of an antidumping duty order directed to certain oil country tubular goods ("OCTG") from the People's Republic of China. *See Am. Tubular Prods., LLC v. United States*, No. 13-00029, 2015 WL 5236010 (Ct. Int'l Trade Aug. 28, 2015) ("*ATP II*") (affirming Commerce's remand results); *Am. Tubular Prods., LLC v. United States*, No. 13-00029, 2014 WL 4977626 (Ct. Int'l Trade Sept. 26, 2014) ("*ATP I*") (affirming in part and remanding in part Commerce's final results). In that administrative review, Commerce ultimately calculated a weighted average dumping margin of 137.62% for Chengde. *See Am. Tubular Prods., LLC v. United States*, No.

13-00029, ECF No. 102 (Ct. Int'l Trade Jan. 28, 2015) ("*Remand Results*"). Because we agree with the Trade Court that Commerce's antidumping duty calculations were supported by substantial evidence and otherwise in accordance with law, we *affirm*.

## BACKGROUND

OCTG are steel tubing products used in oil and gas drilling. Chengde is a Chinese producer and exporter of OCTG, and ATP is the importer of record during the relevant period. In June 2011, Commerce initiated the first administrative review of the antidumping duty order directed to OCTG from China. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 76 Fed. Reg. 37,781 (Dep't of Commerce June 28, 2011); *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 76 Fed. Reg. 53,404 (Dep't of Commerce Aug. 26, 2011) (correcting the period of review). Commerce selected Chengde as a mandatory respondent.

Because China is considered a nonmarket economy ("NME") country, Commerce selected Indonesia, a market economy ("ME") country, as the primary surrogate country from which it would use surrogate values to ascertain Chengde's factors of production. *Certain Oil Country Tubular Goods from the People's Republic of China*, 77 Fed. Reg. 34,013 (Dep't of Commerce June 8, 2012) ("*Preliminary Results*"). In the *Final Results*, as later amended, Commerce assigned Chengde a dumping margin of 162.69%. *Certain Oil Country Tubular Goods from the People's Republic of China*, 77 Fed. Reg. 74,644 (Dep't of Commerce Dec. 17, 2012) ("*Final Results*"), as amended by *Certain Oil Country Tubular Goods from the People's Republic of China*, 78 Fed. Reg. 9,033 (Dep't of Commerce Feb. 7, 2013). The Appellants appealed to the Trade Court, raising three issues that are relevant in this appeal. We provide further factual and procedural background for each of those issues in turn.

## A.   Steel Billets

The first issue pertains to Commerce's valuation of steel billets used in the production of OCTG.  Steel billets may be composed of carbon steel or the more expensive alloy steel.  In its initial questionnaire, Commerce requested Chengde to "[d]escribe each type and grade of material used in the production process."   J.A. 168.  Chengde responded that it consumed steel billets, and its counsel listed a Harmonized Tariff Schedule ("HTS") subheading that covers products of alloy steel as the proper tariff subheading for its steel billets.  J.A. 669.

Commerce then issued supplemental questionnaires, requesting sample mill test certificates for various control numbers ("CONNUMs").  A CONNUM is a code used to identify distinct products within the class of subject merchandise under review.   Chengde submitted the sample mill certificates.  J.A. 1720–25, 3161–71.  Those certificates contained information on the chemical composition of the sampled OCTG, which constituted a portion, but not all, of OCTG sold in sixteen of nineteen sales made by Chengde during the period of review.  In addition, Commerce requested clarification of the technical descriptions of Chengde's raw material inputs.  J.A. 886.  Chengde again responded with a general description of its steel billet input.  J.A. 950–51.

In the *Preliminary Results*, Commerce valued steel billets using a surrogate value for alloy steel.  Chengde then argued that Commerce should have used a surrogate value for carbon steel.  Chengde explained that its counsel's prior reference to the HTS number for alloy steel was an inadvertent error, and that it in fact used carbon steel billets.  Chengde called Commerce's attention to the mill certificates on the record, which showed that the tested OCTG were all made of carbon steel.

In the *Final Results*, as amended, Commerce used a carbon-steel surrogate value, but only for the portion of

OCTG directly shown to be made of carbon steel by the mill certificates. For the remaining OCTG, Commerce continued to value the steel billet input using an alloy-steel surrogate value.

On appeal, the Trade Court remanded Commerce's selection of surrogate values for steel billets. For the sixteen sales partially supported by the mill certificates, the court directed Commerce to "explain whether Chengde's mill certificates prove the chemical properties of OCTG not specifically tested." *ATP I*, 2014 WL 4977626, at *7. Moreover, the court found that Commerce had failed to consider a Customs entry summary relating to an additional (seventeenth) transaction,* which classified the OCTG as carbon steel. The court directed Commerce to assess whether the entry summary proved that the OCTG sold in that transaction were carbon steel. *Id.*

On remand, Commerce explained that it was unable to conclude that the OCTG not specifically tested were necessarily carbon steel, noting the uncertainties in Chengde's sampling process and its failure to provide the requested technical descriptions of its steel billet input. Commerce found, however, that the Customs entry summary established that the entered OCTG were composed of carbon steel. Commerce thus continued to use a carbon-steel surrogate value to value the portion of steel billets for which there was direct evidence, *viz.*, the mill certificates or entry summary, to show that carbon steel billets were consumed. As for the remaining portion of

---

* As to the remaining two of the nineteen sales covered by the review, the Trade Court affirmed Commerce's use of an alloy-steel surrogate value based on evidence of a screenshot of Chengde's website, which showed that the OCTG sold in those two transactions were composed of alloy steel. The Appellants do not challenge that aspect of the Trade Court's decision.

steel billets at issue, Commerce used a *simple average* of the surrogate values for carbon steel billets and alloy steel billets. Accordingly, Commerce recalculated Chengde's weighted average dumping margin as 137.62%.

The Appellants again appealed to the Trade Court. The court sustained Commerce's *Remand Results*, finding that Commerce reasonably chose to use a simple average of the surrogate values of carbon and alloy steel billets for the untested OCTG. *ATP II*, 2015 WL 5236010, at *6–9. The court agreed with Commerce that OCTG under the same contract or CONNUM could have different chemical compositions, *id.* at *7, and that Chengde's mill certificates lacked sufficient detail to establish that the untested OCTG were made of carbon steel, *id.* at *8. The court further noted that Chengde could have shown that its billets were carbon steel by answering Commerce's questionnaires "with exactness," but it failed to do so. *Id.*

## B. Byproduct Offset

The second issue pertains to byproduct offset. The production of OCTG may generate steel scrap, which may be sold for revenue to offset the raw material cost for producing the OCTG that generated the scrap. In its initial questionnaire, Commerce requested information on the quantity of byproduct "produced, sold, reintroduced into production, or otherwise disposed of," as well as records demonstrating the *production* of byproduct during one month of the period of review. J.A. 169. In response, Chengde explained that it did not measure or record steel scrap production at the time it was produced, but rather measured the scrap quantity when it was sold. J.A. 651–52. Chengde provided the quantities of monthly scrap sales for the period of review. J.A. 685–86. Commerce did not request further information regarding scrap offset.

In the *Preliminary Results* and the *Final Results*, Commerce declined to allow any scrap offset because Chengde had failed to quantify the amount of scrap

produced. On appeal, the Trade Court sustained Commerce's denial of scrap offset as supported by substantial evidence and in accordance with law, finding that Chengde had failed to meet Commerce's requirements to secure a scrap offset. *ATP I*, 2014 WL 4977626, at *9–12.

### C.  International Freight

The third issue pertains to Commerce's valuation of Chengde's international freight expense. Chengde reported that most of its OCTG exports to the United States were shipped by carriers based in South Korea, an ME country, and that it paid for ocean freight in U.S. dollars. Chengde showed that it remitted the freight expense via a Chinese freight forwarder, which in turn paid the Chinese agents of the Korean carriers, and those agents then paid the carriers in U.S. dollars. However, Chengde did not provide any evidence on the *amount* paid by the Chinese agents to the Korean carriers. It instead submitted certifications from two Chinese agents stating that payments were made in U.S. dollars, and that actual payment documentation was proprietary.

In the *Preliminary Results*, Commerce calculated international freight using a surrogate value, as if it was purchased from an NME supplier. Commerce continued to do so in the *Final Results*, finding that Chengde had failed to establish that the Korean carriers set the freight price. On appeal, the Trade Court sustained Commerce's use of a surrogate value to calculate international freight. The court observed that "there is no proof that the Korean shippers hired the Chinese agents to collect Chengde's fees," and thus "there is little reason to believe that the price paid to the agents equaled the price remitted to the shippers." *ATP I*, 2014 WL 4977626, at *13.

After the Trade Court affirmed Commerce's *Remand Results*, the Appellants appealed to this court. We have jurisdiction under 28 U.S.C. § 1295(a)(5).

DISCUSSION

In trade cases, we apply the same standard of review as the Trade Court, upholding Commerce's determinations unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Although we review the decisions of the Trade Court *de novo*, "we give great weight to the informed opinion of the [Trade Court] . . . , and it is nearly always the starting point of our analysis." *Ningbo Dafa Chem. Fiber Co. v. United States,* 580 F.3d 1247, 1253 (Fed. Cir. 2009) (internal quotation marks, brackets, and citations omitted).

The Appellants challenge three aspects of Commerce's antidumping duty calculations: (1) Commerce's decision to use a simple average of surrogate values for carbon steel billets and alloy steel billets for the untested OCTG; (2) its denial of scrap byproduct offset; and (3) its treatment of international freight as NME transactions. We address each of those issues in turn.

A. Steel Billets

We first consider whether Commerce erred in using a simple average of surrogate values for carbon steel billets and alloy steel billets for the untested OCTG.

The Appellants argue that the sample mill certificates demonstrate that the untested OCTG were composed of carbon steel, not alloy steel. They emphasize that the untested OCTG were sold in the same transactions under the same CONNUMs as the tested OCTG. They criticize Commerce for not finding the mill certificates representative of the untested OCTG because Commerce requested only sample mill certificates. According to the Appellants, for the seventeen transactions at issue, there is no evidence that Chengde consumed alloy steel billets. They assert that Commerce improperly relied on the erroneous HTS number provided by Chengde's former counsel.

The United States, United States Steel Corporation, TMK IPSCO, Wheatland Tube Co., and V & M Star L.P. (collectively, "the Appellees"), filing three separate briefs, respond that Commerce's selection of surrogate value for steel billet input was supported by substantial evidence. The Appellees contend that the record is inconclusive as to the chemical content of the untested OCTG, and that Chengde failed to prove that all of its steel billets were made of carbon steel. The Appellees note that Chengde used both carbon steel billets, as shown by the mill certificates and entry summary, and alloy steel billets, as shown by Chengde's website, to produce OCTG. They argue that Commerce therefore reasonably valued the steel billets by averaging the surrogate values.

We agree with the Trade Court and the Appellees that substantial evidence supports Commerce's decision to use an average surrogate value of carbon steel and alloy steel. Commerce reasonably concluded that the record did not demonstrate whether the untested OCTG were produced exclusively from carbon steel or alloy steel billets. Rather, it is undisputed that Chengde's website showed that it sold OCTG made of alloy steel under two contracts during the period of review, whereas the sample mill certificates and entry summary showed that Chengde used carbon steel billets for some of its OCTG. Faced with this record, Commerce reasonably used a simple average of the surrogate values for alloy and carbon steel for the portion of the billets for which the type of steel was not apparent. Substantial evidence thus supports Commerce's decision.

As Commerce correctly found, the sample mill certificates submitted by Chengde were limited. They did not indicate whether they represented the entire quantity of a sales contract, and did not provide context for their relevance to the untested products by describing the testing procedures. The certificates represented limited quantities of the sales contracts or CONNUMs involved. Moreover, as Commerce found, the OCTG under each contract

could be produced in multiple heats, *i.e.*, production runs or batches, and that the mill certificates did not list all of the required test results for each heat. Thus, we agree with Commerce and the Trade Court that the mill certificates were not representative of the untested OCTG.

As the Trade Court noted, Commerce repeatedly requested technical descriptions of Chengde's raw material input, but Chengde failed to provide a straightforward and sufficient description of the chemical composition of its steel billets. Chengde's other submissions, including the sample mill certificates, were insufficient to establish the nature of its steel billet input as to the untested OCTG. Given this record, Commerce reasonably valued the untested steel billets by averaging the surrogate values of both carbon and alloy steel. *See Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1337–38 (Fed. Cir. 2016) (explaining that "the burden of creating an adequate record lies with interested parties and not with Commerce" (internal quotation marks and citation omitted)).

We therefore conclude that Commerce's use of a simple average of surrogate values of carbon and alloy steel billets for the untested OCTG is supported by substantial evidence and otherwise in accordance with law.

## B.   Byproduct Offset

We next consider whether Commerce erred in declining to make any scrap byproduct offset because Chengde failed to provide any records to establish the quantity of scrap produced, rather than the quantity of scrap sold.

The Appellants raise numerous arguments challenging Commerce's denial of scrap offset. *First*, they argue that Commerce acted arbitrarily in this case because, in previous cases, it has allowed byproduct offsets based on information similar to that provided by Chengde. *Second*, they argue that 19 U.S.C. § 1677b(f)(1)(A) requires that

Commerce base its cost calculations on the books and records of the producer unless it determines that the information does not "reasonably reflect" actual costs, and that Commerce failed to make such a finding here. *Third*, they argue that under 19 U.S.C. § 1677m(d), when Commerce finds that information submitted by a respondent is deficient, it must notify the party of the deficiency and provide an opportunity for correction, and that Commerce failed to do so here. *Fourth*, they argue that the scrap sales data submitted by Chengde satisfy all of the statutory requirements of 19 U.S.C. § 1677m(e), and thus that Commerce may not decline to consider the information even if it did not comply with all of Commerce's requirements. *Finally*, they argue that Commerce's refusal to make *any* byproduct offset constituted a *de facto* application of adverse facts available, without any finding that Chengde had failed to cooperate to the best of its ability.

The Appellees respond that Commerce reasonably denied Chengde's request for scrap offset because Chengde failed to show that the scrap sold was generated from the production of OCTG, not some other products, and that the scrap was in fact produced during the period of review. The Appellees maintain that Commerce's denial of scrap offset in this case is consistent with its standard practice. The Appellees contend that the statute is silent on scrap offset, and Commerce has filled that gap with regulations. The Appellees also respond that Chengde informed Commerce that it did not account for the quantities of scrap as produced, and thus Commerce was not required to continue asking for that information or to accept Chengde's deficient evidence. Finally, the Appellees respond that Commerce did not apply any adverse inference; rather, according to the Appellees, Commerce simply concluded that Chengde did not meet its burden of establishing the requested scrap offset.

We agree with the Trade Court and the Appellees that Commerce did not err in declining to allow any scrap

offset in this case.  Chengde did not establish the quantity of scrap generated from the production of OCTG during the period of review.  It simply failed to satisfy its evidentiary burden, and Commerce properly decided not to grant the requested offset.

The statute governing the calculation of normal value, 19 U.S.C. § 1677b(c), does not discuss the treatment of byproducts.  Commerce promulgated regulations stating that it may make adjustments to normal value, but that "[t]he interested party that is in possession of the relevant information has the burden of establishing to the satisfaction of the Secretary the amount and nature of a particular adjustment."  19 C.F.R. § 351.401(b).  Accordingly, Chengde bears the burden of establishing its entitlement to a scrap offset.

Here, Chengde submitted documentation of its scrap sales to Commerce, but it could not document the quantity of scrap produced during the period of review.  Chengde's proposed offset calculation instead equated total scrap sold during the period of review with total scrap produced during the period of review.  However, as Commerce explained, Chengde failed to present any evidence to show either that the production of OCTG, the subject merchandise, actually generated the scrap sold, or that the scrap sold was indeed produced during the period of review.  Absent evidence linking the scrap sold with any scrap generated resulting from the production of OCTG during the period of review, Commerce properly found that Chengde's submissions were insufficient and properly denied the requested offset.

We find the Appellants' remaining arguments to be unavailing.  First, this case is factually distinct from the cases cited by the Appellants.  In those cases, Commerce had additional information linking the requested byproduct offset to the production of subject merchandise during the period of review.  Chengde failed to make that show-

ing in this case.  Second, the statutory provisions cited by the Appellants are inapposite.  In this review, Commerce requested Chengde to provide records demonstrating the *production* of OCTG during the period of review.  Chengde unambiguously responded that it did not measure or record steel scrap production at the time it was produced.  On this record, Commerce was not obligated to accommodate Chengde's failure to document scrap production; nor was Commerce obligated to continue asking for information that Chengde clearly stated it did not record.  Lastly, we agree with the Appellees that Commerce did not apply any adverse inference in its denial of scrap offset.  Rather, Chengde simply failed to satisfy its evidentiary burden of establishing the requested offset, as the regulation requires.  *See* 19 C.F.R. § 351.401(b).

Accordingly, we conclude that Commerce's denial of steel scrap offset is supported by substantial evidence and otherwise in accordance with law.

## C.   International Freight

We last consider whether Commerce erred in finding that Chengde's international freight transactions constituted NME transactions.  The Appellants argue that the record evidence shows that Chengde's ocean freight was in fact furnished by ME carriers and that Chengde paid for the freight in U.S. dollars.  They argue that Commerce acted unreasonably in finding that Chengde purchased ocean freight from an NME supplier.

The Appellees respond that Chengde failed to satisfy Commerce's requirements to prove that its ocean freight constituted ME purchases.  Specifically, the Appellees argue that Chengde failed to provide any documentation to establish the amount paid by the Chinese agents to the Korean shippers, or to otherwise show that the price it paid for ocean freight was set by ME shippers.  The Appellees also argue that Commerce has consistently required respondents such as Chengde to link the amount

paid to an NME intermediary or agent with that paid to an ME carrier.

We agree with the Trade Court and the Appellees that Commerce properly calculated Chengde's ocean freight expenses using a surrogate value. The statute presumes that government action distorts the prices that NME exporters pay for their inputs. *See* 19 U.S.C. §§ 1677(18), 1677b(c)(1). In limited circumstances, however, pursuant to the regulation in effect at the relevant time, Commerce would "normally" value an input purchased from an ME supplier and paid for in an ME currency using "the price paid to the [ME] supplier." 19 C.F.R. § 351.408(c)(1) (2012). Accordingly, "under the regulation, merely establishing that the factor was purchased from [an ME] supplier is not enough; rather, the amount paid to the supplier must be documented." *Yantai Oriental Juice Co. v. United States*, 26 Ct. Int'l Trade 605, 615 (2002).

Here, Chengde failed to properly establish the price paid to the ME shippers or to otherwise show that the price it paid for ocean freight was set by the ME shippers. The record shows that Chengde paid its ocean freight expenses to a freight forwarder in China, who then paid the Chinese agents of Korean carriers, who in turn paid the Korean carriers. Because the first two transactions were between Chinese entities, Chengde is required to link the price it paid to the freight forwarder to the price paid to the Korean shippers. However, Chengde failed to make that showing. It only provided declarations that the Chinese agents paid the Korean shippers in U.S. dollars.

Accordingly, the only prices on the record relating to ocean freight are those between Chinese entities, not the prices paid to the Korean carriers. On this record, Commerce properly declined to value Chengde's international freight as an ME input and properly used a surrogate value to calculate international freight costs. *See Nan Ya*, 810 F.3d at 1337–38. We therefore conclude that Com-

merce's decision is supported by substantial evidence and otherwise in accordance with law.

CONCLUSION

We have considered the Appellants' remaining arguments, but find them to be unpersuasive.  For the foregoing reasons, we conclude that Commerce's antidumping duty calculations were supported by substantial evidence and otherwise in according with law.  We therefore affirm the Trade Court's decisions sustaining Commerce's antidumping duty calculations.

**AFFIRMED**